[No. S119248. Apr. 4, 2005.]

CITY OF BURBANK, Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Appellants.
CITY OF LOS ANGELES, Plaintiff and Respondent, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Appellants.

**Counsel**

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Richard M. Frank and Tom Greene, Chief Assistant Attorneys General, Mary E. Hackenbracht, Assistant Attorney General, Marilyn H. Levin and Gregory J. Newmark, Deputy Attorneys General, for Defendants and Appellants.

David S. Beckman and Dan L. Gildor for Natural Resources Defense Counsel, Butte Environmental Council, California Coastkeeper Alliance, CalTrout, Clean Water Action, Clean Water Fund, Coalition on the Environment and Jewish Life of Southern California, Coast Action Group, Defend the Bay, Ecological Rights Foundation, Environment in the Public Interest, Environmental Defense Center, Heal the Bay, Los Angeles Interfaith Environment Council, Ocean Conservancy, Orange County Coastkeeper, San Diego Baykeeper, Santa Barbara Channelkeeper, Santa Monica Baykeeper, Southern California Watershed Alliance, Ventura Coastkeeper, Waterkeeper Alliance, Waterkeepers Northern California, Westside Aquatics, Inc., and Wishtoyo Foundation as Amici Curiae on behalf of Defendants and Appellants.

Downey, Brand, Seymour & Rohwer, Downey Brand, Melissa A. Thorme, Jeffrey S. Galvin, Nicole E. Granquist and Cassandra M. Ferrannini for Plaintiffs and Appellants.

Dennis A. Barlow, City Attorney, and Carolyn A. Barnes, Assistant City Attorney, for Defendant and Appellant City of Burbank.

Rockard J. Delgadillo, City Attorney, and Christopher M. Westhoff, Assistant City Attorney, for Plaintiff and Appellant City of Los Angeles.

Rutan & Tucker and Richard Montevideo for Cities of Baldwin Park, Bell, Cerritos, Diamond Bar, Downey, Gardena, Montebello, Monterey Park, Paramount, Pico Rivera, Rosemead, San Gabriel, San Marino, Santa Fe Springs, Sierra Madre, Signal Hill, Temple City and West Covina, the California Building Industry Association and the Building Industry Legal Defense Foundation as Amici Curiae on behalf of Plaintiffs and Appellants.

Stoel Rives and Lawrence S. Bazel for Western Coalition of Arid States as Amicus Curiae on behalf of Plaintiffs and Appellants.

Richards, Watson & Gershon and John J. Harris for the League of California Cities as Amicus Curiae on behalf of Plaintiffs and Appellants.

Squire, Sanders & Dempsey, Joseph A. Meckes; David W. Burchmore; and Alexandra Dapolito Dunn for Association of Metropolitan Sewerage Agencies as Amicus Curiae on behalf of Plaintiffs and Appellants.

Lewis, Brisbois, Bisgaard & Smith and B. Richard Marsh for County Sanitation Districts of Los Angeles County as Amicus Curiae on behalf of Plaintiffs and Appellants.

Fulbright & Jaworski, Colin Lennard, Patricia Chen; Archer Norris and Peter W. McGaw for California Association of Sanitation Agencies as Amicus Curiae on behalf of Plaintiffs and Appellants.

## OPINION

KENNARD, J.—Federal law establishes national water quality standards but allows the states to enforce their own water quality laws so long as they comply with federal standards. Operating within this federal-state framework, California's nine Regional Water Quality Control Boards establish water quality policy. They also issue permits for the discharge of treated wastewater; these permits specify the maximum allowable concentration of chemical pollutants in the discharged wastewater.

The question here is this: When a regional board issues a permit to a wastewater treatment facility, must the board take into account the facility's costs of complying with the board's restrictions on pollutants in the wastewater to be discharged? The trial court ruled that California law required a regional board to weigh the economic burden on the facility against the expected environmental benefits of reducing pollutants in the wastewater discharge. The Court of Appeal disagreed. On petitions by the municipal operators of three wastewater treatment facilities, we granted review.

We reach the following conclusions: Because both California law and federal law require regional boards to comply with federal clean water standards, and because the supremacy clause of the United States Constitution requires state law to yield to federal law, a regional board, when issuing a wastewater discharge permit, may not consider economic factors to justify imposing pollutant restrictions that are *less stringent* than the applicable federal standards require. When, however, a regional board is considering whether to make the pollutant restrictions in a wastewater discharge permit *more stringent* than federal law requires, California law allows the board to take into account economic factors, including the wastewater discharger's cost of compliance. We remand this case for further proceedings to determine whether the pollutant limitations in the permits challenged here meet or exceed federal standards.

## I.  STATUTORY BACKGROUND

The quality of our nation's waters is governed by a "complex statutory and regulatory scheme . . . that implicates both federal and state administrative responsibilities." (*PUD No. 1 of Jefferson County v. Washington Department of Ecology* (1994) 511 U.S. 700, 704 [128 L.Ed.2d 716, 114 S.Ct. 1900].) We first discuss California law, then federal law.

### A.  *California Law*

In California, the controlling law is the Porter-Cologne Water Quality Control Act (Porter-Cologne Act), which was enacted in 1969. (Wat. Code, § 13000 et seq., added by Stats. 1969, ch. 482, § 18, p. 1051.)[1] Its goal is "to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (§ 13000.) The task of accomplishing this belongs to the State Water Resources Control Board (State Board) and the nine Regional Water Quality Control Boards; together the State Board and the regional boards comprise "the principal state agencies with primary responsibility for the coordination and control of water quality." (§ 13001.) As relevant here, one of those regional boards oversees the Los Angeles region (the Los Angeles Regional Board).[2]

■  Whereas the State Board establishes statewide policy for water quality control (§ 13140), the regional boards "formulate and adopt water quality control plans for all areas within [a] region" (§ 13240). The regional boards' water quality plans, called "basin plans," must address the beneficial uses to be protected as well as water quality objectives, and they must establish a program of implementation. (§ 13050, subd. (j).) Basin plans must be consistent with "state policy for water quality control." (§ 13240.)

### B.  *Federal Law*

In 1972, Congress enacted amendments (Pub.L. No. 92-500 (Oct. 18, 1972) 86 Stat. 816) to the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), which, as amended in 1977, is commonly known as the Clean

---

[1] Further undesignated statutory references are to the Water Code.

[2] The Los Angeles water region "comprises all basins draining into the Pacific Ocean between the southeasterly boundary, located in the westerly part of Ventura County, of the watershed of Rincon Creek and a line which coincides with the southeasterly boundary of Los Angeles County from the ocean to San Antonio Peak and follows thence the divide between San Gabriel River and Lytle Creek drainages to the divide between Sheep Creek and San Gabriel River drainages." (§ 13200, subd. (d).)

Water Act. The Clean Water Act is a "comprehensive water quality statute designed to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' " (*PUD No. 1 of Jefferson County v. Washington Dept. of Ecology, supra,* 511 U.S. at p. 704, quoting 33 U.S.C. § 1251(a).) The act's national goal was to eliminate by the year 1985 "the discharge of pollutants into the navigable waters" of the United States. (33 U.S.C. § 1251(a)(1).) To accomplish this goal, the act established "effluent limitations," which are restrictions on the "quantities, rates, and concentrations of chemical, physical, biological, and other constituents"; these effluent limitations allow the discharge of pollutants only when the water has been satisfactorily treated to conform with federal water quality standards. (33 U.S.C. §§ 1311, 1362(11).)

■   Under the federal Clean Water Act, each state is free to enforce its own water quality laws so long as its effluent limitations are not "less stringent" than those set out in the Clean Water Act. (33 U.S.C. § 1370.) This led the California Legislature in 1972 to amend the state's Porter-Cologne Act "to ensure consistency with the requirements for state programs implementing the Federal Water Pollution Control Act." (§ 13372.)

■   Roughly a dozen years ago, the United States Supreme Court, in *Arkansas v. Oklahoma* (1992) 503 U.S. 91 [117 L.Ed.2d 239, 112 S.Ct. 1046], described the distinct roles of the state and federal agencies in enforcing water quality: "The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' 33 U.S.C. § 1251(a). Toward this end, [the Clean Water Act] provides for two sets of water quality measures. 'Effluent limitations' are promulgated by the [Environmental Protection Agency (EPA)] and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources.[3] See §§ 1311, 1314. '[W]ater quality standards' are, in general, promulgated by the States and establish the desired condition of a waterway. See § 1313. These standards supplement effluent limitations 'so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels.' *EPA v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 205, n. 12 [48 L.Ed.2d 578, 96 S.Ct. 2022, 2025, n. 12] (1976).'

---

[3] A "point source" is "any discernible, confined and discrete conveyance" and includes "any pipe, ditch, channel . . . from which pollutants . . . may be discharged." (33 U.S.C. § 1362 (14).)

■ "The EPA provides States with substantial guidance in the drafting of water quality standards. See generally 40 CFR pt. 131 (1991) (setting forth model water quality standards). Moreover, [the Clean Water Act] requires, *inter alia*, that state authorities periodically review water quality standards and secure the EPA's approval of any revisions in the standards. If the EPA recommends changes to the standards and the State fails to comply with that recommendation, the Act authorizes the EPA to promulgate water quality standards for the State. 33 U.S.C. § 1313(c)." (*Arkansas v. Oklahoma, supra*, 503 U.S. at p. 101.)

■ Part of the federal Clean Water Act is the National Pollutant Discharge Elimination System (NPDES), "[t]he primary means" for enforcing effluent limitations and standards under the Clean Water Act. (*Arkansas v. Oklahoma, supra*, 503 U.S. at p. 101.) The NPDES sets out the conditions under which the federal EPA or a state with an approved water quality control program can issue permits for the discharge of pollutants in wastewater. (33 U.S.C. § 1342(a) & (b).) In California, wastewater discharge requirements established by the regional boards are the equivalent of the NPDES permits required by federal law. (§ 13374.)

With this federal and state statutory framework in mind, we now turn to the facts of this case.

## II. Factual Background

This case involves three publicly owned treatment plants that discharge wastewater under NPDES permits issued by the Los Angeles Regional Board.

The City of Los Angeles owns and operates the Donald C. Tillman Water Reclamation Plant (Tillman Plant), which serves the San Fernando Valley. The City of Los Angeles also owns and operates the Los Angeles-Glendale Water Reclamation Plant (Los Angeles-Glendale Plant), which processes wastewater from areas within the City of Los Angeles and the independent cities of Glendale and Burbank. Both the Tillman Plant and the Los Angeles-Glendale Plant discharge wastewater directly into the Los Angeles River, now a concrete-lined flood control channel that runs through the City of Los Angeles, ending at the Pacific Ocean. The State Board and the Los Angeles Regional Board consider the Los Angeles River to be a navigable water of the United States for purposes of the federal Clean Water Act.

The third plant, the Burbank Water Reclamation Plant (Burbank Plant), is owned and operated by the City of Burbank, serving residents and businesses within that city. The Burbank Plant discharges wastewater into the Burbank Western Wash, which drains into the Los Angeles River.

All three plants, which together process hundreds of millions of gallons of sewage each day, are tertiary treatment facilities; that is, the treated wastewater they release is processed sufficiently to be safe not only for use in watering food crops, parks, and playgrounds, but also for human body contact during recreational water activities such as swimming.

In 1998, the Los Angeles Regional Board issued renewed NPDES permits to the three wastewater treatment facilities under a basin plan it had adopted four years earlier for the Los Angeles River and its estuary. That 1994 basin plan contained general narrative criteria pertaining to the existing and potential future beneficial uses and water quality objectives for the river and estuary.[4] The narrative criteria included municipal and domestic water supply, swimming and other recreational water uses, and fresh water habitat. The plan further provided: "All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." The 1998 permits sought to reduce these narrative criteria to specific numeric requirements setting daily maximum limitations for more than 30 pollutants present in the treated wastewater, measured in milligrams or micrograms per liter of effluent.[5]

The Cities of Los Angeles and Burbank (Cities) filed appeals with the State Board, contending that achievement of the numeric requirements would be too costly when considered in light of the potential benefit to water quality, and that the pollutant restrictions in the NPDES permits were unnecessary to meet the narrative criteria described in the basin plan. The State Board summarily denied the Cities' appeals.

Thereafter, the Cities filed petitions for writs of administrative mandate in the superior court. They alleged, among other things, that the Los Angeles Regional Board failed to comply with sections 13241 and 13263, part of California's Porter-Cologne Act, because it did not consider the economic burden on the Cities in having to reduce substantially the pollutant content of their discharged wastewater. They also alleged that compliance with the pollutant restrictions set out in the NPDES permits issued by the regional

---

[4] This opinion uses the terms "narrative criteria" or descriptions, and "numeric criteria" or effluent limitations. Narrative criteria are broad statements of desirable water quality goals in a water quality plan. For example, "no toxic pollutants in toxic amounts" would be a narrative description. This contrasts with numeric criteria, which detail specific pollutant concentrations, such as parts per million of a particular substance.

[5] For example, the permits for the Tillman and Los Angeles-Glendale Plants limited the amount of fluoride in the discharged wastewater to 2 milligrams per liter and the amount of mercury to 2.1 micrograms per liter.

board would greatly increase their costs of treating the wastewater to be discharged into the Los Angeles River. According to the City of Los Angeles, its compliance costs would exceed $50 million annually, representing more than 40 percent of its entire budget for operating its four wastewater treatment plants and its sewer system; the City of Burbank estimated its added costs at over $9 million annually, a nearly 100 percent increase above its $9.7 million annual budget for wastewater treatment.

The State Board and the Los Angeles Regional Board responded that sections 13241 and 13263 do not require consideration of costs of compliance when a regional board issues a NPDES permit that restricts the pollutant content of discharged wastewater.

The trial court stayed the contested pollutant restrictions for each of the three wastewater treatment plants. It then ruled that sections 13241 and 13263 of California's Porter-Cologne Act required a regional board to consider costs of compliance not only when it adopts a basin or water quality plan but also when, as here, it issues an NPDES permit setting the allowable pollutant content of a treatment plant's discharged wastewater. The court found no evidence that the Los Angeles Regional Board had considered economic factors at either stage. Accordingly, the trial court granted the Cities' petitions for writs of mandate, and it ordered the Los Angeles Regional Board to vacate the contested restrictions on pollutants in the wastewater discharge permits issued to the three municipal plants here and to conduct hearings to consider the Cities' costs of compliance before the board's issuance of new permits. The Los Angeles Regional Board and the State Board filed appeals in both the Los Angeles and Burbank cases.[6]

The Court of Appeal, after consolidating the cases, reversed the trial court. It concluded that sections 13241 and 13263 require a regional board to take into account "economic considerations" when it adopts water quality standards in a basin plan but not when, as here, the regional board sets specific pollutant restrictions in wastewater discharge permits intended to satisfy those standards. We granted the Cities' petition for review.

---

[6] Unchallenged on appeal and thus not affected by our decision are the trial court's rulings that (1) the Los Angeles Regional Board failed to show how it derived from the narrative criteria in the governing basin plan the specific numeric pollutant limitations included in the permits; (2) the administrative record failed to support the specific effluent limitations; (3) the permits improperly imposed daily maximum limits rather than weekly or monthly averages; and (4) the permits improperly specified the manner of compliance.

### III. Discussion

#### A. *Relevant State Statutes*

The California statute governing the issuance of *wastewater permits* by a regional board is section 13263, which was enacted in 1969 as part of the Porter-Cologne Act. (See *ante*, at p. 619.) Section 13263 provides in relevant part: *"The regional board*, after any necessary hearing, *shall prescribe requirements as to the nature of any proposed discharge* [of wastewater]. *The requirements* shall implement any relevant water quality control plans that have been adopted, and *shall take into consideration* the beneficial uses to be protected, the water quality objectives reasonably required for that purpose, other waste discharges, the need to prevent nuisance, and *the provisions of Section 13241."* (§ 13263, subd. (a), italics added.)

Section 13241 states: "Each regional board shall establish such water quality objectives in water quality control plans as in its judgment will ensure the reasonable protection of beneficial uses and the prevention of nuisance; however, it is recognized that it may be possible for the quality of water to be changed to some degree without unreasonably affecting beneficial uses. Factors to be considered by a regional board in establishing water quality objectives shall include, but not necessarily be limited to, all of the following:

"(a) Past, present, and probable future beneficial uses of water.

"(b) Environmental characteristics of the hydrographic unit under consideration, including the quality of water available thereto.

"(c) Water quality conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area.

"(d) *Economic considerations.*

"(e) The need for developing housing within the region.

"(f) The need to develop and use recycled water." (Italics added.)

The Cities here argue that section 13263's express reference to section 13241 requires the Los Angeles Regional Board to consider section 13241's listed factors, notably "[e]conomic considerations," before issuing NPDES permits requiring specific pollutant reductions in discharged effluent or treated wastewater.

Thus, at issue is language in section 13263 stating that when a regional board "prescribe[s] requirements as to the nature of any proposed discharge" of treated wastewater it must "take into consideration" certain factors including "the provisions of Section 13241." According to the Cities, this statutory language requires that a regional board make an independent evaluation of the section 13241 factors, including "economic considerations," before restricting the pollutant content in an NPDES permit. This was the view expressed in the trial court's ruling. The Court of Appeal rejected that view. It held that a regional board need consider the section 13241 factors only when it adopts a basin or water quality plan, but not when, as in this case, it issues a wastewater discharge permit that sets specific numeric limitations on the various chemical pollutants in the wastewater to be discharged. As explained below, the Court of Appeal was partly correct.

B. *Statutory Construction*

■ When construing any statute, our task is to determine the Legislature's intent when it enacted the statute "so that we may adopt the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726]; see *Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].) In doing this, we look to the statutory language, which ordinarily is "the most reliable indicator of legislative intent." (*Hassan, supra*, at p. 715.)

■ As mentioned earlier, our Legislature's 1969 enactment of the Porter-Cologne Act, which sought to ensure the high quality of water in this state, predated the 1972 enactment by Congress of the precursor to the federal Clean Water Act. Included in California's original Porter-Cologne Act were sections 13263 and 13241. Section 13263 directs regional boards, when issuing wastewater discharge permits, to take into account various factors, including those set out in section 13241. Listed among the section 13241 factors is "[e]conomic considerations." (§ 13241, subd. (d).) The plain language of sections 13263 and 13241 indicates the Legislature's intent in 1969, when these statutes were enacted, that a regional board consider the cost of compliance when setting effluent limitations in a wastewater discharge permit.

Our construction of sections 13263 and 13241 does not end with their plain statutory language, however. We must also analyze them in the context of the statutory scheme of which they are a part. (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].) Like sections 13263 and 13241, section 13377 is part of the Porter-Cologne Act. But unlike the former two statutes, section 13377 was

not enacted until 1972, shortly after Congress, through adoption of the Federal Water Pollution Control Act Amendments, established a comprehensive water quality policy for the nation.

■ Section 13377 specifies that wastewater discharge permits issued by California's regional boards must meet the federal standards set by federal law. In effect, section 13377 forbids a regional board's consideration of any economic hardship on the part of the permit holder if doing so would result in the dilution of the requirements set by Congress in the Clean Water Act. That act prohibits the discharge of pollutants into the navigable waters of the United States unless there is compliance with federal law (33 U.S.C. § 1311(a)), and publicly operated wastewater treatment plants such as those before us here must comply with the act's clean water standards, regardless of cost (see *id.,* §§ 1311(a), (b)(1)(B) & (C), 1342(a)(1) & (3)). ■ Because section 13263 cannot authorize what federal law forbids, it cannot authorize a regional board, when issuing a wastewater discharge permit, to use compliance costs to justify pollutant restrictions that do not comply with federal clean water standards.[7] Such a construction of section 13263 would not only be inconsistent with federal law, it would also be inconsistent with the Legislature's declaration in section 13377 that all discharged wastewater must satisfy federal standards.[8] This was also the conclusion of the Court of Appeal. Moreover, under the federal Constitution's supremacy clause (art. VI), a state law that conflicts with federal law is " 'without effect.' " (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608]; see *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 923 [12 Cal.Rptr.3d 262, 88 P.3d 1].) To comport with the principles of federal supremacy, California law cannot authorize this

---

[7] The concurring opinion misconstrues both state and federal clean water law when it describes the issue here as "whether the Clean Water Act prevents or prohibits the regional water board from considering economic factors to justify pollutant restrictions *that meet the clean water standards in more cost-effective and economically efficient ways.*" (Conc. opn. of Brown, J., *post,* at p. 629, some italics added.) This case has nothing to do with meeting federal standards in more cost effective and economically efficient ways. State law, as we have said, allows a regional board to consider a permit holder's compliance cost to *relax* pollutant concentrations, as measured by numeric standards, for pollutants in a wastewater discharge permit. (§§ 13241 & 13263.) Federal law, by contrast, as stated above in the text, "prohibits the discharge of pollutants into the navigable waters of the United States unless there is compliance with federal law (33 U.S.C. § 1311(a)), and publicly operated wastewater treatment plants such as those before us here must comply with the [federal] act's *clean water standards, regardless of cost* (see *id.,* §§ 1311(a), (b)(1)(B) & (C), 1342(a)(1) & (3))." (Italics added.)

[8] As amended in 1978, section 13377 provides for the issuance of waste discharge permits that comply with federal clean water law "together with any more stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance." We do not here decide how this provision would affect the cost-consideration requirements of sections 13241 and 13263 when more stringent effluent standards or limitations in a permit are justified for some reason independent of compliance with federal law.

state's regional boards to allow the discharge of pollutants into the navigable waters of the United States in concentrations that would exceed the mandates of federal law.

Thus, in this case, whether the Los Angeles Regional Board should have complied with sections 13263 and 13241 of California's Porter-Cologne Act by taking into account "economic considerations," such as the costs the permit holder will incur to comply with the numeric pollutant restrictions set out in the permits, depends on whether those restrictions meet or exceed the requirements of the federal Clean Water Act. We therefore remand this matter for the trial court to resolve that issue.

### C. *Other Contentions*

The Cities argue that requiring a regional board at the wastewater discharge permit stage to consider the permit holder's cost of complying with the board's restrictions on pollutant content in the water is consistent with federal law. In support, the Cities point to certain provisions of the federal Clean Water Act. They cite section 1251(a)(2) of title 33 United States Code, which sets, as a national goal *"wherever attainable,"* an interim goal for water quality that protects fish and wildlife, and section 1313(c)(2)(A) of the same title, which requires consideration, among other things, of waters' *"use and value* for navigation" when revising or adopting a "water quality standard." (Italics added.) These two federal statutes, however, pertain not to permits for wastewater discharge, at issue here, but to establishing water quality standards, not at issue here. Nothing in the federal Clean Water Act suggests that a state is free to disregard or to weaken the federal requirements for clean water when an NPDES permit holder alleges that compliance with those requirements will be too costly.

At oral argument, counsel for amicus curiae National Resources Defense Council, which argued on behalf of California's State Board and regional water boards, asserted that the federal Clean Water Act incorporates state water policy into federal law, and that therefore a regional board's consideration of economic factors to justify greater pollutant concentration in discharged wastewater would conflict with the federal act even if the specified pollutant restrictions were not less stringent than those required under federal law. We are not persuaded. The federal Clean Water Act reserves to the states significant aspects of water quality policy (33 U.S.C. § 1251(b)), and it specifically grants the states authority to "enforce any effluent limitation" that is not *"less stringent"* than the federal standard (33 U.S.C. § 1370, italics added). It does not prescribe or restrict the factors that a state may consider when exercising this reserved authority, and thus it does not prohibit

a state—when imposing effluent limitations that are *more stringent* than required by federal law—from taking into account the economic effects of doing so.

Also at oral argument, counsel for the Cities asserted that if the three municipal wastewater treatment facilities ceased releasing their treated wastewater into the concrete channel that makes up the Los Angeles River, it would (other than during the rainy season) contain no water at all, and thus would not be a "navigable water" of the United States subject to the Clean Water Act. (See *Solid Waste Agency v. United States Army Corps of Engineers* (2001) 531 U.S. 159, 172 [148 L.Ed.2d 576, 121 S.Ct. 675] ["The term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made."].) It is unclear when the Cities first raised this issue. The Court of Appeal did not discuss it in its opinion, and the Cities did not seek rehearing on this ground. (See Cal. Rules of Court, rule 28(c)(2).) Concluding that the issue is outside our grant of review, we do not address it.

## Conclusion

Through the federal Clean Water Act, Congress has regulated the release of pollutants into our national waterways. The states are free to manage their own water quality programs so long as they do not compromise the federal clean water standards. When enacted in 1972, the goal of the Federal Water Pollution Control Act Amendments was to *eliminate* by the year 1985 the discharge of pollutants into the nation's navigable waters. In furtherance of that goal, the Los Angeles Regional Board indicated in its 1994 basin plan on water quality the intent, insofar as possible, to remove from the water in the Los Angeles River toxic substances in amounts harmful to humans, plants, and aquatic life. What is not clear from the record before us is whether, in limiting the chemical pollutant content of wastewater to be discharged by the Tillman, Los Angeles-Glendale, and Burbank wastewater treatment facilities, the Los Angeles Regional Board acted only to implement requirements of the federal Clean Water Act or instead imposed pollutant limitations that exceeded the federal requirements. This is an issue of fact to be resolved by the trial court.

## Disposition

We affirm the judgment of the Court of Appeal reinstating the wastewater discharge permits to the extent that the specified numeric limitations on chemical pollutants are necessary to satisfy federal Clean Water Act requirements for treated wastewater. The Court of Appeal is directed to remand this

matter to the trial court to decide whether any numeric limitations, as described in the permits, are "more stringent" than required under federal law and thus should have been subject to "economic considerations" by the Los Angeles Regional Board before inclusion in the permits.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BROWN, J., Concurring.**—I write separately to express my frustration with the apparent inability of the government officials involved here to answer a simple question: How do the federal clean water standards (which, as near as I can determine, are the state standards) prevent the state from considering economic factors? The majority concludes that because "the supremacy clause of the United States Constitution requires state law to yield to federal law, a regional board, when issuing a wastewater discharge permit, may not consider economic factors to justify imposing pollutant restrictions that are *less stringent* than the applicable federal standards require." (Maj. opn., *ante*, at p. 618.) That seems a pretty self-evident proposition, but not a useful one. The real question, in my view, is whether the Clean Water Act prevents or prohibits the regional water board from considering economic factors to justify pollutant restrictions that *meet* the clean water standards in more cost-effective and economically efficient ways. I can see no reason why a federal law—which purports to be an example of cooperative federalism— would decree such a result. I do not think the majority's reasoning is at fault here. Rather, the agencies involved seemed to have worked hard to make this simple question impenetrably obscure.

A brief review of the statutory framework at issue is necessary to understand my concerns.

## I. Federal Law

"In 1972, Congress enacted the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act (CWA) [Citation.] . . . [¶] Generally, the CWA 'prohibits the discharge of any pollutant except in compliance with one of several statutory exceptions. [Citation.]' . . . The most important of those exceptions is pollution discharge under a valid NPDES [National Pollution Discharge Elimination System] permit, which can be issued either by the Environmental Protection Agency (EPA), or by an EPA-approved state permit program such as California's. [Citations.] NPDES permits are valid for five years. [Citation.] [¶] Under the CWA's NPDES permit system, the states are required to develop *water quality standards*. [Citations.] A water quality standard 'establish[es] the desired condition of a waterway.' [Citation.] A water quality standard for any

given waterway, or 'water body,' has two components: (1) the designated beneficial uses of the water body and (2) the *water quality criteria* sufficient to protect those uses. [Citations.] [¶] Water quality criteria can be either *narrative* or *numeric*. [Citation.]" (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1092–1093 [1 Cal.Rptr.3d 76].)

With respect to satisfying water quality standards, "a polluter must comply with *effluent limitations*. The CWA defines an effluent limitation as 'any restriction established by a State or the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.' [Citation.] 'Effluent limitations are a means of *achieving* water quality standards.' [Citation.] [¶] NPDES permits establish effluent limitations for the polluter. [Citations.] CWA's NPDES permit system provides for a two-step process for the establishing of effluent limitations. First, the polluter must comply with *technology-based effluent limitations*, which are limitations based on the best available or practical technology for the reduction of water pollution. [Citations.] [¶] Second, the polluter must also comply with more stringent *water quality-based effluent limitations* (WQBEL's) where applicable. In the CWA, Congress 'supplemented the "technology-based" effluent limitations with "water quality-based" limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." ' [Citation.] [¶] The CWA makes WQBEL's applicable to a given polluter whenever WQBEL's are 'necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations . . . .' [Citations.] Generally, NPDES permits must conform to state water quality laws insofar as the state laws impose more stringent pollution controls than the CWA. [Citations.] Simply put, WQBEL's implement water quality standards." (*Communities for a Better Environment v. State Water Resources Control Bd., supra*, 109 Cal.App.4th at pp. 1093–1094, fns. omitted.)

This case involves water quality-based effluent limitations. As set forth above, "[u]nder the CWA, states have the primary role in promulgating water quality standards." (*Piney Run Preservation Ass'n v. Commrs. of Carroll Co.* (4th Cir. 2001) 268 F.3d 255, 265, fn. 9.) "Under the CWA, the water quality standards referred to in section 301 [see 33 U.S.C. § 1311] are primarily the states' handiwork." (*American Paper Institute, Inc. v. U.S. Envtl. Protection Agency* (D.C. Cir. 1993) 302 U.S. App. D.C. 80 [996 F.2d 346, 349] (*American Paper*).) In fact, upon the 1972 passage of the CWA, "[s]tate water quality standards in effect at the time . . . were deemed to be the initial water quality benchmarks for CWA purposes . . . . The states were to revisit and, if

necessary, revise those initial standards at least once every three years." (*American Paper*, at p. 349.) Therefore, "once a water quality standard has been promulgated, section 301 of the CWA requires all NPDES permits for point sources to incorporate discharge limitations necessary to satisfy that standard." (*American Paper*, at p. 350.) Accordingly, it appears that in most instances, state water quality standards are identical to the federal requirements for NPDES permits.

## II.  State Law

In California, pursuant to the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.; Stats. 1969, ch. 482, § 18, p. 1051; hereafter Porter-Cologne Act), the regional water quality control boards establish water quality standards—and therefore federal requirements for NPDES permits—through the adoption of water quality control plans (basin plans). The basin plans establish water quality objectives using enumerated factors—including economic factors—set forth in Water Code section 13241.

In addition, as one court observed: "The Porter-Cologne Act . . . established nine regional boards to prepare water quality plans (known as basin plans) and issue permits governing the discharge of waste. (Wat. Code, §§ 13100, 13140, 13200, 13201, 13240, 13241, 13243.) The Porter-Cologne Act identified these permits as 'waste discharge requirements,' and provided that the waste discharge requirements must mandate compliance with the applicable regional water quality control plan. (Wat. Code, §§ 13263, subd. (a), 13377, 13374.) [¶] Shortly after Congress enacted the Clean Water Act in 1972, the California Legislature added Chapter 5.5 to the Porter-Cologne Act, for the purpose of adopting the necessary federal requirements to ensure it would obtain EPA approval to issue NPDES permits. (Wat. Code, § 13370, subd. (c).) As part of these amendments, the Legislature provided that the state and regional water boards 'shall, as required or authorized by the [Clean Water Act], issue waste discharge requirements . . . which apply and ensure compliance with all applicable provisions [of the Clean Water Act], together with any more stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance.' (Wat. Code, § 13377.) Water Code section 13374 provides that '[t]he term "waste discharge requirements" as referred to in this division is the equivalent of the term "permits" as used in the [Clean Water Act].' [¶] California subsequently obtained the required approval to issue NPDES permits. [Citation.] Thus, the waste discharge requirements issued by the regional water boards ordinarily also serve as NPDES permits under federal law. (Wat. Code, § 13374.)" (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875 [22 Cal.Rptr.3d 128].)

Applying this federal-state statutory scheme, it appears that throughout this entire process, the Cities of Burbank and Los Angeles (Cities) were unable to have economic factors considered because the Los Angeles Regional Water Quality Control Board (Board)—the body responsible to enforce the statutory framework—failed to comply with its statutory mandate.

For example, as the trial court found, the Board did not consider costs of compliance when it initially established its basin plan, and hence the water quality standards. The Board thus failed to abide by the statutory requirement set forth in Water Code section 13241 in establishing its basin plan. Moreover, the Cities claim that the initial narrative standards were so vague as to make a serious economic analysis impracticable. Because the Board does not allow the Cities to raise their economic factors in the permit approval stage, they are effectively precluded from doing so. As a result, the Board appears to be playing a game of "gotcha" by allowing the Cities to raise economic considerations when it is not practical, but precluding them when they have the ability to do so.

Moreover, the Board acknowledges that it has neglected other statutory provisions that might have provided an additional opportunity to air these concerns. As set forth above, pursuant to the CWA, "[t]he states were to revisit and, if necessary, revise those initial standards at least once every three years—a process commonly known as triennial review. [Citation.] Triennial reviews consist of public hearings in which current water quality standards are examined to assure that they 'protect the public health or welfare, enhance the quality of water and serve the purposes' of the Act. [Citation.] Additionally, the CWA directs states to consider a variety of competing policy concerns during these reviews, including a waterway's 'use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes.' " (*American Paper, supra,* 996 F.2d at p. 349.)

According to the Cities, "[t]he last time that the narrative water quality objective for toxicity contained in the Basin Plan was reviewed and modified was 1994." The Board does not deny this claim. Accordingly, the Board has failed its duty to allow public discussion—including economic considerations—at the required intervals when making its determination of proper water quality standards.

What is unclear is why this process should be viewed as a contest. State and local agencies are presumably on the same side. The costs will be paid by taxpayers and the Board should have as much interest as any other agency in fiscally responsible environmental solutions.

Our decision today arguably allows the Board to continue to shirk its statutory duties. The majority holds that when read together, Water Code sections 13241, 13263, and 13377 do not allow the Board to consider economic factors when issuing NPDES permits to satisfy federal CWA requirements. (Maj. opn., *ante,* at pp. 625–627.) The majority then bifurcates the issue when it orders the Court of Appeal "to remand this matter to the trial court to decide whether any numeric limitations, as described in the permits, are 'more stringent' than required under federal law and thus should have been subject to 'economic considerations' by the Los Angeles Regional Board before inclusion in the permits." (*Id.* at pp. 628–629.)

The majority overlooks the feedback loop established by the CWA, under which federal standards are linked to state-established water quality standards, including narrative water quality criteria. (See 33 U.S.C. § 1311 (b)(1)(C); 40 C.F.R. § 122.44(d)(1) (2004).) Under the CWA, NPDES permit requirements include the state narrative criteria, which are incorporated into the Board's basin plan under the description "no toxins in toxic amounts." As far as I can determine, NPDES permits designed to achieve this narrative criteria (as well as designated beneficial uses) will usually implement the state's basin plan, while satisfying federal requirements as well.

If federal water quality standards are typically identical to state standards, it will be a rare instance that a state exceeds its own requirements and economic factors are taken into consideration.[1] In light of the Board's initial failure to consider costs of compliance and its repeated failure to conduct required triennial reviews, the result here is an unseemly bureaucratic bait-and-switch that we should not endorse. The likely outcome of the majority's decision is that the Cities will be economically burdened to meet standards imposed on them in a highly questionable manner.[2] In these times of tight fiscal budgets, it is difficult to imagine imposing additional financial burdens on municipalities without at least allowing them to present alternative views.

Based on the facts of this case, our opinion today appears to largely retain the status quo for the Board. If the Board can actually demonstrate that only the precise limitations at issue here, implemented in only one way, will achieve the desired water standards, perhaps its obduracy is justified. That case has yet to be made.

---

[1] (But see *In the Matter of the Petition of City and County of San Francisco, San Francisco Baykeeper et al.* (Order No. WQ 95-4, Sept. 21, 1995) 1995 WL 576920.)

[2] Indeed, given the fact that "water quality standards" in this case are composed of broadly worded components (i.e., a narrative criteria and "designated beneficial uses of the water body"), the Board possessed a high degree of discretion in setting NPDES permit requirements. Based on the Board's past performance, a proper exercise of this discretion is uncertain.

Accordingly, I cannot conclude that the majority's decision is wrong. The analysis may provide a reasonable accommodation of conflicting provisions. However, since the Board's actions "make me wanna holler and throw up both my hands,"[3] I write separately to set forth my concerns and concur in the judgment—*dubitante*.[4]

The petitions of all appellants and respondent for a rehearing were denied June 29, 2005. Brown, J., did not participate therein.

---

[3] Marvin Gaye (1971) "Inner City Blues."

[4] I am indebted to Judge Berzon for this useful term. (See *Credit Suisse First Boston Corp. v. Grunwald* (9th Cir. 2005) 400 F.3d 1119 [2005 WL 466202] (conc. opn. of Berzon, J.).)