[No. D046112. Fourth Dist., Div. One. Nov. 29, 2006.]

DIVERS' ENVIRONMENTAL CONSERVATION ORGANIZATION, Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents;
UNITED STATES DEPARTMENT OF THE NAVY et al., Real Parties in Interest and Respondents.

248

## COUNSEL

Briggs Law Corporation, Cory J. Briggs; Environmental Advocates and Suzanne E. Bevash for Plaintiff and Appellant.

Lawyers for Clean Water, Inc., Daniel Cooper and Layne Friedrich for California Coastkeeper Alliance as Amicus Curiae on behalf of Plaintiff and Appellant.

Bill Lockyer, Attorney General, Mary Hackenbracht and Carol A. Squire, Deputy Attorneys General, for Defendants and Respondents.

No appearance for Real Parties in Interest and Respondents.

## OPINION

**BENKE, Acting P. J.**—This is an appeal from an order denying a petition for a writ of mandate. The petition challenged a discharge permit respondent California Regional Water Quality Control Board, San Diego Region (the Regional Board), issued to real parties in interest United States Department of the Navy et al. (Navy). We affirm. Although the Regional Board could have issued a permit that imposed numeric limits on chemicals in the Navy's stormwater discharges into San Diego Bay, under provisions of the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act (CWA), and applicable regulations, the Regional Board was authorized to instead require that the Navy limit its stormwater chemical discharges by employing so-called "best management practices" (BMP's). Given these circumstances, we reject appellant Divers' Environmental Conservation Organization's (Divers') contention that the permit was defective for its failure to analyze or impose numeric limits on chemicals in the Navy's stormwater discharges.

## SUMMARY

In November 2002 the Regional Board issued a National Pollutant Discharge Elimination System (NPDES) permit to the Navy governing discharges from the Naval Base San Diego Complex[1] (the base complex) to San Diego Bay. The permit includes regulations governing stormwater discharges from the base complex to the bay. In particular, the permit requires that the Navy develop and adopt a "Storm Water Pollution Prevention Plan" (the prevention plan), which employs BMP's[2] designed to reduce or eliminate pollutants received into the bay from industrial activities at the base complex. The permit requires that the prevention plan identify and evaluate sources of pollution that might affect stormwater discharges from the base complex and then implement site-specific BMP's to reduce or prevent pollutants in the base complex's stormwater discharges. Under the permit the Navy is required

---

[1] The base complex includes four installations: Naval Station, San Diego; Mission Gorge Recreational Facility; Broadway Complex; and the Naval Medical Center, San Diego.

[2] The permit defines BMP's as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the United States. The BMPs also include treatment measures, operating procedures, and practices to control facility site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage. The BMPs may include any type of pollution prevention and pollution control measure necessary to achieve compliance with this Order."

to consider implementing nonstructural BMP's, such as good housekeeping, preventative maintenance, spill response procedures, material handling and storage procedures, employee training programs, recycling procedures, and erosion controls. Where nonstructural BMP's are not effective, the permit requires that the Navy consider structural BMP's, such as structures which cover chemicals and other pollutants, retention ponds, berms and other devices which channel runoff away from pollutant sources and treatment facilities, such as vegetative swales, which reduce pollutants in stormwater discharges.

In addition to the prevention plan and based on the Regional Board's study of water quality, the permit contains a numeric limit on the amount of toxicity in the Navy's total effluent. This limitation requires that test organisms be able to survive in the effluent. The permit also prohibits the discharge of the first quarter-inch of runoff from "high-risk" areas.

The Regional Board's study of water quality noted that levels of copper and zinc in stormwater runoff were matters of concern. In addition to the BMP's and limitation on toxicity in the total effluent discharges, the permit set forth "benchmarks" for copper and zinc. The permit requires the Navy to measure the concentration of copper and zinc in its stormwater discharges and if they exceed the benchmark levels, the Navy must commence an iterative process of reviewing and upgrading its BMP's.

The permit requires that the Navy annually review all BMP's to determine "whether the BMP's are properly designed, implemented, and are effective in reducing and preventing pollutants in storm water discharges." In the event the Regional Board finds the prevention plan does meet the requirements of the permit, the permit requires the plan be revised to implement additional BMP's.

Before the permit was finally adopted by the Regional Board, Divers' challenged it administratively. Divers' argued that applicable federal regulations required that instead of regulating the Navy's industrial stormwater discharges by way of a BMP's-based prevention plan, the Regional Board was required to set numeric "water quality based effluent limitations" (WQBEL's) on the Navy's stormwater discharges and that before setting those numeric WQBEL's the Navy was required to conduct an analysis of particular pollutants for which there was a reasonable potential the stormwater

discharges would cause or contribute to a violation of any state water quality standard. The Regional Board rejected Divers's argument and adopted the permit without numeric WQBEL's and without performing any analysis of particular pollutants in the Navy's stormwater discharges. Divers' filed an administrative petition with respondent State Water Resources Control Board (State Board). The administrative petition was dismissed on the grounds it failed to raise substantial issues appropriate for review by the State Board.

Divers' filed a petition for a writ of administrative mandate (Code Civ. Proc., § 1094.5) against the State Board and the Regional Board. The trial court dismissed the State Board as a defendant. As against the Regional Board, Divers' alleged the board abused its discretion in failing to conduct an analysis of the reasonable potential impact of particular stormwater pollutants on state water quality standards and in failing to impose numeric WQBEL's on the Navy's stormwater discharges. The trial court denied Divers's petition. Divers' filed a timely notice of appeal.

## DISCUSSION

### I

#### *Standard of Review*

"[O]ur standard of review must extend appropriate deference to the administrative agencies in this case, and their technical expertise. [Citations.] And while interpretation of a statute or regulation is ultimately a question of law, we must also defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision." (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1103–1104 [1 Cal.Rptr.3d 76] (*Communities*).)

### II

#### *The Clean Water Act*

"In 1972, Congress enacted the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act (CWA). [Citation.] The goal of the CWA is 'to restore and maintain the chemical,

physical, and biological integrity of the Nation's waters.' (33 U.S.C. § 1251(a); see *Arkansas v. Oklahoma* (1992) 503 U.S. 91, 101 [117 L.Ed.2d 239, 112 S.Ct. 1046, 1054] (*Arkansas*).) [¶] Generally, the CWA 'prohibits the discharge of any pollutant except in compliance with one of several statutory exceptions. [Citation.]' [Citation.] The most important of those exceptions is pollution discharge under a valid NPDES permit, which can be issued either by the Environmental Protection Agency (EPA), or by an EPA-approved state permit program such as California's. [Citations.] NPDES permits are valid for five years. [Citation.]" (*Communities, supra*, 109 Cal.App.4th at p. 1092.)

Initially, the CWA regulated permittees by requiring them to adopt technology-based effluent limitations. (33 U.S.C. § 1311(b)(1)(A).) These are limitations based on the best available or practical technology for the reduction of water pollution.

After July 1, 1977, permittees were required to not only adopt technology-based effluent limitations but more WQBEL's. "In the CWA, Congress 'supplemented the "technology-based" effluent limitations with "water quality-based" limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." ' [Citation.]" (*Communities, supra*, 109 Cal.App.4th at p. 1093.)

■ In general terms the CWA and governing regulations require that in addition to determining an applicant's obligations by focusing on what technology can be used on the applicant's discharges, the permitting agency must also focus on the quality of the body of water into which the applicant is discharging pollutants. Thus under 40 Code of Federal Regulations part 122.44(d)(1)(i) (2005), WQBEL's must be imposed on applicants "whenever the permitting agency determines that pollutants 'are or may be discharged at a level which will cause, or *have the reasonable potential to cause, or contribute* to an excursion above any State water quality standard . . . .' " (*Communities, supra*, 109 Cal.App.4th at p. 1094.) Under 40 Code of Federal Regulations part 122.44(d)(1)(ii) in making the determination about whether WQBEL's are required "the permitting authority shall use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water."

■ When, after employing the procedures and analysis required by 40 Code of Federal Regulations part 122.44(d)(1)(ii), a permitting agency determines that an applicant's discharge "has the reasonable potential to cause . . . an in-stream excursion above . . . a State water quality standard for an individual pollutant" the permit must contain effluent limits for that pollutant. (40 C.F.R. § 122.44(d)(1)(iii) (2005).)

As we explain more fully below, this appeal rests in large measure on Divers's contention that 40 Code of Federal Regulations part 122.44(d)(1) mandated a numeric analysis of individual pollutants in the Navy's stormwater and numeric WQBEL's for pollutants which would cause the bay to exceed applicable water quality standards. As we explain, we do not adopt this interpretation of the regulations. Briefly, as we read the regulations, the analysis which is mandatory in all cases is the more general analysis required by part 122.44(d)(1)(ii); only if that analysis results in a finding that discharges are likely to exceed state numeric criteria for a particular pollutant are limits for that pollutant required. However, as we believe is the case here, an analysis of stormwater discharges may satisfy the requirements of part 122.44(d)(1)(ii) without any numeric analysis of individual pollutants and hence without giving rise to any obligation to impose specific pollutant limitations under part 122.44(d)(1)(iii).

III

*Stormwater Discharges*

Before 1987 the CWA did not expressly regulate stormwater discharges.[3] In 1987 Congress added subdivision (p) to section 402 of the CWA

---

[3] Shortly after the CWA was enacted in 1972 "the EPA promulgated regulations exempting *most municipal storm sewers from the NPDES permit requirements.* [Citations.] When environmental groups challenged this exemption in federal court, the Ninth Circuit held a storm sewer is a point source and the EPA did not have the authority to exempt categories of point sources from the Clean Water Act's NPDES permit requirements. [Citation.] The *Costle* court [(*Natural Resources Defense Council, Inc. v. Costle* (D.C. Cir. 1977) 568 F.2d 1369)] rejected the EPA's argument that effluent-based storm sewer regulation was administratively infeasible because of the variable nature of storm water pollution and the number of affected storm sewers throughout the country. [Citation.] Although the court acknowledged the practical problems relating to storm sewer regulation, the court found the EPA had the flexibility under the Clean Water Act to design regulations that would overcome these problems. [Citation.]

"During the next 15 years, the EPA made numerous attempts to reconcile the statutory requirement of point source regulation with the practical problem of regulating possibly millions of diverse point source discharges of storm water. [Citations.]

"Eventually, in 1987, Congress amended the Clean Water Act to add provisions that specifically concerned NPDES permit requirements for storm sewer discharges. [Citations.]" (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 873–874 [22 Cal.Rptr.3d 128].)

(33 U.S.C. § 1342(p)),[4] which expressly requires NPDES permits for storm-water discharges either associated with industrial activity or from municipal storm sewer systems. Section 402(p)(4)(A) of the CWA gave the administrator of the EPA until 1989 to promulgate regulations governing storm-water discharges from industrial polluters and large municipalities;

---

[4] Section 402(p) of the CWA states:
"(p) Municipal and industrial storm water discharges
"(1) General rule
"Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under section 1342 of this title) shall not require a permit under this section for discharges composed entirely of storm water.
"(2) Exceptions
"Paragraph (1) shall not apply with respect to the following storm water discharges:
"(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.
"(B) A discharge associated with industrial activity.
"(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.
"(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.
"(E) A discharge for which the Administrator or the State, as the case may be, determines that the storm water discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.
"(3) Permit requirements
"(A) Industrial discharges
"Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.
"(B) Municipal discharge
"Permits for discharges from municipal storm sewers—
"(i) may be issued on a system- or jurisdiction-wide basis;
"(ii) shall include a requirement to effectively prohibit non-storm water discharges into the storm sewers; and
"(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.
"(4) Permit application requirements
"(A) Industrial and large municipal discharges
"Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for storm water discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.
"(B) Other municipal discharges
"Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for storm water discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator

applicants for stormwater permits were given until 1990 to make applications and the EPA or state was given until 1991 to issue or deny the permit.

In regulating stormwater permits the EPA has repeatedly expressed a preference for doing so by way of BMP's, rather than by way of imposing either technology-based or water quality-based numerical limitations. "Unlike discharges of process wastewater where numeric effluent limitations (technology-based and/or water-quality-based) are typically used to control the discharge of pollutants from industrial facilit[y's], the primary permit condition used to address discharges of pollutants in a facilities stormwater is a pollution prevention plan. The development and implementation of a site-specific stormwater pollution prevention plan is considered to be the most important requirement of the EPA and State issued stormwater general permits. Site-specific stormwater pollution prevention plans allow permittees to develop and implement 'best management practices', whether structural or non-structural, that are best suited for controlling stormwater discharges from their industrial facility." (U.S. EPA NPDES Permit Writers' Manual (Dec. 1996) pp. 149–150; see also U.S. E.P.A. Interim Permitting Strategy Approach for Water Quality-Based Effluent Limitations in Storm Water Permits, 61 Fed.Reg. 43761 (Aug. 26, 1996); and U.S. E.P.A. Questions and Answers, 61 Fed.Reg. 57425 (Nov. 6, 1996).) In addition to the rationale it has expressed, the EPA also adopted 40 Code of Federal Regulations part 122.44(k) (2005)

---

or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

"(5) Studies

"The Administrator, in consultation with the States, shall conduct a study for the purposes of—

"(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

"(B) determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

"(C) establishing procedures and methods to control storm water discharges to the extent necessary to mitigate impacts on water quality.

"Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

"(6) Regulations

"Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate storm water discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State storm water management programs, and (C) establish expeditious deadlines. The program may include performance standards, guide-lines, guidance, and management practices and treatment requirements, as appropriate."

so that the regulation reads, in part, as follows: "[E]ach NPDES permit shall include conditions meeting the following requirements when applicable. [¶] . . . [¶]

"(k) Best management practices (BMPs) to control or abate the discharge of pollutants when:

"(1) Authorized under section 304(e) of the CWA for the control of toxic pollutants and hazardous substances from ancillary industrial activities;

"(2) Authorized under section 402(p) of the CWA for the control of stormwater discharges;

"(3) Numeric effluent limitations are infeasible; or

"(4) The practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA."

As we explain more fully below, essentially 40 Code of Federal Regulations part 122.44(k)(2) (2005) allows permitting agencies to treat BMP's as the type of WQBEL's appropriate for control of stormwater discharges.

IV

*Reasonable Potential Analysis*

In its first argument on appeal Divers' contends that because the Regional Board did not identify and analyze the numeric level of particular pollutants in the Navy's stormwater discharges, it did not perform the reasonable potential analysis required by 40 Code of Federal Regulations part 122.44(d)(1) (2005).

■ Contrary to Divers's argument, 40 Code of Federal Regulations part 122.44(d)(1) (2005) does not require that in all cases a permitting authority analyze the particular pollutants in an applicant's stormwater discharges. As we have seen, the procedures a permitting agency must engage in in performing the required reasonable potential analysis are set forth in 40 Code of Federal Regulations part 122.44(d)(1)(ii). By its terms that portion of the regulation does not require any analysis of particular pollutants. Rather, it only requires that the permitting authority use procedures that account for existing controls, the variability of the pollutants in effluent, the sensitivity of

species to toxicity, and the dilution of effluent in receiving waters. (40 C.F.R. § 122.44(d)(1)(ii).) While, as Divers' points out, a numeric analysis of particular pollutants would in most instances be the most effective means of meeting the requirements of 40 Code of Federal Regulations part 122.44(d)(1)(ii), that is not the only means of meeting the requirements of the regulation. As the trial court noted, the Regional Board performed a water quality analysis and made extensive findings with respect to the toxicity of copper and zinc in the Navy's discharge and established benchmarks for concentrations of those chemicals in the Navy's discharges. The fact the studies the Regional Board performed did not produce numeric analysis of all the potential pollutants in the Navy's stormwater discharges did not prevent the Regional Board from nonetheless concluding, on the basis of the studies it did perform, that the stormwater discharges had a reasonable potential to cause or contribute to pollution in the bay above state water quality standards. As the Regional Board points out and the EPA has repeatedly noted, stormwater consists of a variable stew of pollutants, including toxic pollutants, from a variety of sources which impact a receiving body on a basis which is only as predictable as the weather. Given these circumstances the Regional Board could reasonably conclude that any attempt to provide a numeric analysis of pollutants in stormwater discharges was not the most effective means of determining whether WQBEL's were nonetheless needed for the Navy's stormwater discharges.

█ Inherent in the flexibility we find in 40 Code of Federal Regulations part 122.44(d)(1)(ii) (2005) is our conclusion the BMP'S authorized by 40 Code of Federal Regulations section 122.44(k)(2) are in fact WQBEL's, which a permitting authority may employ when it has found that stormwater discharges may cause a receiving body to exceed state water quality standards. In reaching this conclusion we are persuaded by the reasoning the court adopted in *Communities*, where the opponent of a permit argued that numeric WQBEL's were required by 40 Code of Federal Regulations part 122.44(d)(1). "Case law is limited. A few cases seem to assume that a WQBEL is always a number, but the cases do not squarely address and decide the issue. [Citations.] But *Natural Resources Defense Council, Inc. v. Costle* (D.C. Cir. 1977) 186 U.S. App. D.C. 147 [568 F.2d 1369] (*Costle*), suggests that Congress did not intend numeric effluent limitations to be the only limitation on pollution discharges under the CWA, but intended a flexible approach including alternative effluent control strategies. [Citation.]

"We find instructive a prior decision of the State Board, of which we have taken judicial notice: *In the Matter of the Petition of Citizens for a Better Environment, Save San Francisco Bay Association, and Santa Clara Valley*

*Audubon Society* (Order No. WQ 91-03, May 16, 1991) 1991 WL 135460 (Cal.St.Wat.Res.Bd.). In that order, the State Board stated: "The petitioners contend that the Clean Water Act, and regulations and court decisions interpreting the Act, require the inclusion of numeric effluent limitations in NPDES permits . . . . We have reviewed these authorities, and also opinions we have received from EPA, and conclude that numeric effluent limitations are not legally required. Further, we have determined that the program of prohibitions, source control measures and "best management practices" set forth in the permit constitutes effluent limitations as required by law.' [Citation.]

"The State Board noted the EPA's regulatory definition of 'effluent limitation' was broad, and noted that the *Costle* decision supported the conclusion that numeric limitations were not required—especially since CWA ' "gives EPA considerable flexibility in framing the permit to achieve a desired reduction in pollutant discharges. . . ." ' [Citation.]

"Specifically referring to section 122.44(d)(1), the State Board noted the regulation did not contain 'the term "numeric" effluent limitation. . . . Concededly, in most cases, the easiest and most effective chemical-specific limitation would be numeric. However, there is no legal requirement that effluent limitations be numeric.' [Citation.]" (*Communities, supra,* 109 Cal.App.4th at pp. 1104–1105.)

 Where, as in the case of stormwater discharges, BMP's will be the WQBEL's employed, the study performed under 40 Code of Federal Regulations part 122.44(d)(1)(ii) (2005) must at a minimum look to the likely impact of stormwater as a whole on the receiving body; however, as we have seen, the BMP's that may be imposed if there is a determination that state water quality standards will be exceeded are usually systemic procedures tailored to decrease the overall risk toxic pollutants from the discharger will reach stormwater runoff. Because there is no direct correlation between the type and volume of toxic pollutants in stormwater and the BMP's that will be employed to reduce those volumes, a permitting authority can reasonably conclude that in the case of stormwater discharges such a detailed numeric analysis is not a cost-effective means of performing a "reasonable potential" analysis. In sum, contrary to Divers' contention, the Regional Board was not required to perform a numeric analysis of each pollutant in the Navy's stormwater discharges.

## V

*Feasibility Study*

Divers' does not accept our conclusion the Regional Board was authorized to employ BMP's in lieu of numeric WQBEL's. Instead, Divers' argues that in the case of industrial permits, such as the one the Navy obtained, BMP's are permissible only upon a finding by the permitting authority that numeric WQBEL's are not feasible. We do not read 40 Code of Federal Regulations part 122.44(k)(2) (2005) so narrowly.

As we have noted, 40 Code of Federal Regulations part 122.44(k)(2) (2005) gives permitting authorities the power to impose BMP's when they are "[a]uthorized under section 402(p) of the CWA for the control of storm water discharges." Divers' contends that section 402(p) of the CWA (33 U.S.C. § 1342(p)) does not authorize BMP's to control *industrial* stormwater discharges and that the only authority for use of BMP's in an industrial setting is provided by 40 Code of Federal Regulations part 122.44(k)(3), which permits BMP's when numeric effluent limitations are not feasible.

Divers' fundamentally misinterprets section 402(p) of the CWA. Before enactment of section 402(p) there was considerable controversy over whether and in what manner stormwater discharges were subject to permitting under the CWA. (See *Building Industry Assn. of San Diego County v. State Water Resources Control Bd., supra,* 124 Cal.App.4th at pp. 873–874.) Enactment of section 402(p) made it clear that such discharges were subject to the permitting requirements of the CWA and gave the EPA broad discretion in developing and enforcing rules governing stormwater discharges. In this context BMP's are expressly mentioned in the statute as one of the limitations a permitting authority may impose in municipal stormwater permits. (See 33 U.S.C. § 1342(p)(3)(B)(iii).) However, neither the absence of an express reference to BMP's in industrial settings nor the illustrative reference with respect to municipal stormwater permits, is very persuasive in determining whether, as the Regional Board and the EPA have found, in enacting section 402(p) Congress intended to authorize a wide array of controls over all stormwater discharges, including use of BMP's. In this regard we note the final paragraph of section 402(p) contains a further reference to BMP'S and gives the EPA the power to use management practices as a means, among others, of controlling stormwater discharges from sources other than industrial activities and municipalities. This reference to management practices, along with the reference to the use of BMP's in municipal settings, show that in enacting section 402(p) of the CWA, Congress clearly recognized the role of BMP's as a means of controlling pollutants in stormwater discharges.

In sum, there is nothing on the face of the statute that suggests that in making express reference to BMP's in particular instances Congress intended to limit use of BMP's in controlling stormwater discharges in general.[5] Indeed, we can discern no rationale which would permit BMP's in the case of municipalities and other nonindustrial stormwater discharges but bar them in the case of industrial discharges. Thus the EPA, along with the Regional Board, could reasonably conclude that in enacting section 402(p) of the CWA. Congress intended to permit the EPA and permitting authorities wide discretion in regulating stormwater runoff, including the use of BMP's where the agencies believed they were appropriate.

Because the Regional Board and EPA's interpretation of section 402(p) of the CWA is not at odds with either the language or overall purposes of the statute, we must accept it. (See *Communities, supra,* 109 Cal.App.4th at p. 1104.) Accordingly, read in light of that interpretation of the statute, 40 Code of Federal Regulations part 122.44(k)(2) (2005) fully authorized the Regional Board to use BMP's as the principal means of limiting the Navy's stormwater discharges.

## VI

### *Benchmarks*

As we have noted, under the permit the Navy is required to determine whether levels of zinc and copper in its stormwater discharges reach designated benchmarks, and if they do the Navy is then required to review and amend its BMP's. The benchmarks for these chemicals is higher than applicable water quality standards for San Diego Bay as set forth in the EPA's California toxic rule (CTR). (See 65 Fed.Reg. 31682–31719 (May 18, 2000).) Contrary to Divers's argument, the discrepancy between the benchmarks and CTR standards does not invalidate the permit.

The CTR was adopted by the EPA because California failed to adopt final water quality standards as required by the CWA. (See 33 U.S.C. § 1313(c); 40 C.F.R. §§ 131.6, 131.12 (2005).) The standards set forth in the CTR are expressed as numeric criteria for specific toxic pollutants and apply to California's inland waters and enclosed bays and estuaries. Following the holding in *Communities,* it is now clear that in implementing numeric

---

[5] As we noted in *Building Industry Assn. of San Diego County v. State Water Resources Control Bd., supra,* 124 Cal.App.4th at page 874, under section 402(p)(3)(B)(iii) of the CWA municipalities are only required to reduce "pollutants to the maximum extent practicable," whereas stormwater from industrial discharges must be governed by WQBEL's. Nothing in our opinion in *Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* addressed the specific question raised here: whether a permitting authority may use BMP's as a means of limiting industrial stormwater waste.

water quality standards, such as those set forth in the CTR, permitting agencies are not required to do so solely by way of corresponding numeric WQBEL's. (*Communities, supra,* 109 Cal.App.4th at pp. 1095, 1104–1105.) In *Communities* the court stated: "[A] water quality *standard* can be numeric; the question before us is whether a *WQBEL,* which implements a . . . numeric water quality standard, *must itself* be numeric." (*Id.* at p. 1095.) The court then went on to answer this question in the negative. (*Id.* at pp. 1104–1105.)

We also note that in adopting the CTR, the EPA took note of the use of BMP's as a means of controlling municipal runoff and stated that the EPA "believes that compliance with water quality standards through the use of Best Management Practices (BMPs) is appropriate." (65 Fed.Reg. 31703 (May 18, 2000).) This reference to BMP's, in the context of adopting the CTR, supports the Regional Board's contention that the CTR does not require it to impose the CTR's numeric water quality *standards* as numeric *limits* on toxic substances in the Navy's stormwater discharges.

In sum the Regional Board was empowered to enforce the CTR by way of the BMP's and benchmarks set forth in the permit. Although the CTR governs the entire bay, including the point of any discharge, in employing benchmarks for further action by the Navy, the permit does not in any manner authorize the Navy to violate the CTR. In this context the benchmarks only serve as a means of ensuring that the Navy will monitor toxicity of its stormwater discharges and take appropriate action in the event it discovers toxicity at designated levels. As the Regional Board points out, it is fully capable of taking enforcement action against the Navy in the event a violation of the CTR occurs.

VII

*Delegation of Discretion*

Finally, we note that Divers' contends that in allowing the Navy to develop a prevention plan, including BMP's, the permit delegated too much discretion to the Navy. Our review of the record does not support this contention. The requirements of the prevention plan the Navy must develop are set forth in an 18-page attachment to the permit. The attachment sets forth in some detail what the plan must include in terms of identifying sources of pollution, monitoring, recordkeeping and reporting. In particular, we note the permit provides that "[u]pon notification by the Regional Board and/or local agency that the [prevention plan] does not meet one or more of the minimum requirements of this Section," the Navy must revise the plan and implement

additional BMP's that are effective in reducing and eliminating pollutants in its discharges. Thus the permit both carefully limits the Navy's discretion in developing a prevention plan and provides for meaningful regulatory review of the prevention plan. (See *Environmental Defense Center, Inc. v. U.S. E.P.A.* (9th Cir. 2003) 344 F.3d 832, 856.)

Judgment affirmed.[6]

Nares, J., and Haller, J., concurred.

A petition for a rehearing was denied December 27, 2006.

---

[6] Amicus curiae California Coastkeeper Alliance asked that we take judicial notice of data it prepared and filed with the State Board in other proceedings and after the Regional Board issued the Navy's permit. We deny the request for judicial notice. Appellant's objection to respondents' lodgment of exhibits is overruled.