[No. C052237. Third Dist. Aug. 9, 2007.]

COUNTY OF SACRAMENTO, Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Respondents.

1580

COUNSEL

Robert A. Ryan, Jr., County Counsel, John H. Dodds, Deputy County Counsel; Somach, Simmons & Dunn, Paul S. Simmons, Kristen T. Castanos and Andrew M. Hitchings for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Mary E. Hackenbracht, Chief Assistant Attorney General, and Bruce Reeves, Deputy Attorney General, for Defendants and Respondents.

OPINION

**MORRISON, J.**—The County of Sacramento (County) appeals from denial of its petition for a writ of mandate directing the State Water Resources Control Board and the Regional Water Quality Control Board for the Central Valley Region (collectively, the Boards) to rescind and vacate their water quality orders that apply to the Boys Ranch wastewater treatment plant insofar as the orders establish limitations for coliform effluent. The County contends the water quality orders are inconsistent with the basin plan for the Central Valley Region and the Boards failed to comply with the requirements of the Water Code in adopting a new interpretation. We find the water quality orders are consistent with the applicable basin plan and affirm.

BACKGROUND

*Porter-Cologne Water Quality Control Act*

"It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." (Cal. Const., art. X, § 2.)

California's policy on water quality is set forth in the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.; all further undesignated section references are to the Water Code). "[A]ctivities and factors which may affect the quality of the waters of the state shall be regulated to attain the

highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (§ 13000.) This act is administered by the State Water Resources Control Board (the State Board) and nine regional boards. (§§ 13001, 13200.)

█ Each regional board is required to adopt a water quality control plan for all areas in the region; the plan must be consistent with the state policy for water quality control. (§ 13240.) A regional water quality control plan is also known as a basin plan. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619 [26 Cal.Rptr.3d 304, 108 P.3d 862].) The State Board reviews and approves the basin plan. (§ 13245.) A basin plan designates or establishes the beneficial uses to be protected, the water quality objectives, and the program of implementation for achieving the water quality objectives. (§ 13050, subd. (j).) A water quality objective sets the limits or levels of water quality constituents or characteristics for reasonable protection of beneficial uses of water or the prevention of nuisance in the specific area. (§ 13050, subd. (h).)

█ In establishing water quality objectives, the regional board must consider various factors, including, but not limited to: "(a) Past, present, and probable future beneficial uses of water. [¶] (b) Environmental characteristics of the hydrographic unit under consideration, including the quality of water available thereto. [¶] (c) Water quality conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area. [¶] (d) Economic considerations. [¶] (e) The need for developing housing within the region. [¶] (f) The need to develop and use recycled water." (§ 13241.)

█ The regional board prescribes requirements for waste discharge within the region. (§ 13263.) These requirements shall implement the relevant basin plan and take into consideration the beneficial uses to be protected and the factors set forth in section 13241. (§ 13263, subd. (a).)

*The Basin Plan*

The California Regional Water Quality Control Board for the Central Valley Region (the Regional Board) adopted a basin plan for the Sacramento River Basin and the San Joaquin River Basin (the Basin Plan). The Basin Plan states the primary goal of water quality planning is the protection and

enhancement of existing and potential beneficial uses. This protection and enhancement of beneficial uses is achieved by setting quality and quantity objectives for surface waters and groundwaters. The Basin Plan sets forth various beneficial use designations. As relevant here, one of the designations is: "Municipal and Domestic Supply (MUN)—Uses of water for community, military, or individual water supply systems including, but not limited to, drinking water supply." Unless otherwise designated by the Regional Board, all groundwater in the region is considered suitable, or potentially suitable, at a minimum, for municipal and domestic water supply (MUN) and various other beneficial uses.

The Basin Plan sets forth water quality objectives. In establishing these water quality objectives, the Regional Board considered the factors set forth in section 13241, including past, present and probable future beneficial uses of water. The Basin Plan sets the water quality objectives for groundwater. These objectives "apply to all ground waters of the Sacramento and San Joaquin River Basins, as the objectives are relevant to the protection of designated beneficial uses." It is the water quality objective for bacteria that is at issue in this case. The Basin Plan sets the water quality objective for bacteria as follows: "In ground waters used for domestic or municipal supply (MUN) the most probable number of coliform organisms over any seven-day period shall be less than 2.2/100 ml."

### *The Waste Discharge Requirements*

The County owns and operates the Boys Ranch, a youth correctional facility of approximately 100 wards and 70 staff. The Boys Ranch is located 12 miles south of Folsom and approximately one mile west of Scott Road. The land around the Boys Ranch is zoned for agricultural and residential uses. Residential properties are a minimum of 40 acres. There is no public water supply utility; all residences must rely on individual wells for water. The Boys Ranch obtains its water supply from a well.

The Boys Ranch has a wastewater treatment facility for its domestic wastewater. The wastewater treatment facility consists of a gravity collection system, a 9,000-gallon temporary storage and holding tank, a sewage distribution box, and two unlined percolation/evaporation ponds. The two ponds cover approximately 2.9 acres. Wastewater is concentrated through evaporation and infiltrates into the bottom soils of the ponds. Approximately 7.6 inches of wastewater infiltrates through the ponds each month. The well for the Boys Ranch is located approximately 10,000 feet west of the ponds. There are fewer than three private residences within a three-mile radius of the facility; the closest is a mile and a half away.

The Boys Ranch wastewater treatment facility is subject to waste discharge requirements set forth in orders from the Regional Board. The original requirement, adopted in the mid-1960's, required that waste discharge from the Boys Ranch wastewater treatment facility not cause pollution of usable groundwaters or surface waters.

In 1985, the Regional Board issued order No. 85-200 for waste discharge requirements for the Boys Ranch wastewater treatment facility. It required that discharges not cause pollution or nuisance or degrade the water supply.

In 2001, the Regional Board adopted updated waste discharge requirements for the Boys Ranch wastewater treatment facility. The Regional Board found the wastewater quality had a reasonable potential to impact the underlying groundwater and required certain monitoring to determine if the Boys Ranch was employing the best practical treatment and control (BPTC), as required by resolution 68-16, the anti-degradation policy. This new waste discharge requirement, order No. 5-01-256, established interim groundwater limitations that would not unreasonably threaten present and anticipated beneficial uses or result in groundwater quality that exceeds water quality objectives in the Basin Plan. The requirements could be reopened after monitoring. The limitation for total coliform organisms in ground was set at "nondetect."

The County sought review of this order before the State Board.

After settlement discussions, the County and the Regional Board resolved many of the disputed issues; four issues remained unresolved. The State Board issued order No. WQO 2003-0014 addressing these issues. The County had challenged the interim limits for coliform organisms in groundwater. The State Board found that the Basin Plan set a water quality objective for bacteria that applies to groundwater at a most probable number (MPN) of coliform organism over a seven-day period of less than 2.2/100 ml, and that was also the level at which coliform could be detected. The State Board directed the Regional Board to revise its waste discharge order No. 5-01-256 to include a numeric groundwater limitation. The State Board found the Regional Board had authority to set interim limits for groundwater and those limits must be set at less than 2.2 MPN/100 ml.

In January 2004, the Regional Board adopted a revised waste discharge requirements order for the Boys Ranch wastewater treatment facility. This order, No. R5-2004-0003, set groundwater limitations for total coliform organisms at less than 2.2 MPN/100 ml over any seven-day period.

The County again sought review by the State Board. The County contended these wastewater discharge requirements were invalid. The State

Board dismissed the County's petition for review on the basis that it failed to raise substantial issues that were appropriate for review.

The County then petitioned for a writ of mandate. In a first amended petition, the County challenged State Board order No. WQO 2003-0014 and Regional Board orders Nos. 5-01-256 and R5-2004-0003, contending the water quality objective for bacteria applied to the Boys Ranch wastewater treatment facility was in violation of the law.

The trial court denied the petition. The County appealed.

## DISCUSSION

The County contends the State Board and the Regional Board misapplied the water quality objective for bacteria in groundwater set forth in the Basin Plan. The Basin Plan's water quality objective for groundwater states: "In ground waters *used for* domestic or municipal supply (MUN) the most probable number of coliform organisms over any seven-day period shall be less than 2.2/100 ml." (Italics added.) The County contends this water quality objective is not applicable to the Boys Ranch Wastewater treatment facility because the groundwater in the vicinity is not *used for* domestic or municipal supply. The County asserts this water quality objective applies only where the groundwater is *currently* being used for domestic or municipal supply.

The parties agree that we examine the Boards' interpretation of legal matters utilizing a de novo standard of review. (*County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 997 [50 Cal.Rptr.3d 619] [mod. 144 Cal.App.4th 589f].) We defer to the Boards' expertise as appropriate in the circumstances. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

Here, the State Board directed the Regional Board to include the numeric groundwater limitation for bacteria in the Basin Plan in a revised order for the Boys Ranch wastewater treatment facility. Thus, the State Board interpreted the Basin Plan's water quality objective to apply where the groundwater was designated MUN.

■ The County contends the Boards' interpretation is incorrect under the basic rules of statutory construction. As a starting point, the interpretation of an administrative regulation is subject to the same principles as the interpretation of a statute. (*Blumenfeld v. San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 59 [117 Cal.Rptr. 327].) However, there is an important difference between the interpretation of a statute and the interpretation of a regulation. " 'The Legislature has no authority to interpret a

statute.' " (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1158, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873], quoting *Del Costello v. State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8 [185 Cal.Rptr. 582]; followed in *People v. Cruz* (1996) 13 Cal.4th 764, 781 [55 Cal.Rptr.2d 117, 919 P.2d 731].) On the other hand, where the language of the regulation is ambiguous, it is appropriate to consider the agency's interpretation. (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 883 [22 Cal.Rptr.3d 128].) Indeed, we defer to an agency's interpretation of a regulation involving its area of expertise, " 'unless the interpretation flies in the face of the clear language and purpose of the interpretive provision' [Citation.]" (*Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 252 [51 Cal.Rptr.3d 497].)

As we shall see, in this case, the agency's interpretation of its own regulation makes all the difference.

Relying on dictionary definitions, the County asserts that "used for" cannot mean "designated." The County argues that "designated" is a term of art under the Porter-Cologne Water Quality Control Act and has a meaning clearly distinguishable from "used." Designated beneficial uses include future or potential uses; "used for" is more limited in temporal scope.

The Boards criticize the County's reliance on dictionary definitions to resolve the question of proper interpretation. (See *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.* (2001) 93 Cal.App.4th 531, 539, fn. 1 [113 Cal.Rptr.2d 300].) They also raise various practical problems with the County's interpretation. Determining a current use may be difficult, especially where there are intermittent uses. The County argues no groundwater in the vicinity of the Boys Ranch wastewater treatment facility is currently used for MUN, but fails to define "vicinity." Further, if the Regional Board cannot regulate bacteria in groundwater unless such water is currently being used as a water supply, such water may become so contaminated that it could never be used for drinking water.

■ The County also relies upon the different language used in the other water quality objectives in the Basin Plan. While the water quality objective for bacteria states it applies "in ground waters used for domestic or municipal supply (MUN)," the water quality objectives for chemical constituents and radioactivity apply to "ground waters designated for use as domestic or municipal supply (MUN)." The County argues this difference in language is meaningful. "When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the

normal inference is that the Legislature intended a difference in meaning. [Citation.]" (*People v. Trevino* (2001) 26 Cal.4th 237, 242 [109 Cal.Rptr.2d 567, 27 P.3d 283].)

The County contends other regional boards have distinguished between a designated use and current use. For example, the groundwater quality objective for bacteria in the Basin Plan for the Tulare Lake Basin applies to "ground waters designated MUN." The County requests this court take judicial notice of portions of the Basin Plans for the North Coast Region and the Los Angeles Region to show how regional boards employ the different terms "used for" and "designated" in water quality objectives. The Boards object to consideration of other basin plans as irrelevant to the issue before the court. We agree. At most, these other basin plans show that different terms are used, but not their effect. The County has not offered evidence of the waste discharge requirements issued under these basin plans to show how the differing terms are interpreted. We deny the County's request for judicial notice of exhibits A and B.

We reject the County's contention that the phrase "used for" is limited in temporal scope and cannot include future uses. In general parlance, the phrase is broad and includes both present and future uses. For example, "chairs are used for sitting," is not limited to the chairs' current use.

The term "used for" is thus ambiguous as to whether it includes designated uses or only current uses. Thus, as stated earlier, where the language is ambiguous, we will defer to the agency's interpretation of a regulation involving its area of expertise, " 'unless the interpretation flies in the face of the clear language and purpose of the interpreted provision.' " The Boards' interpretation is completely consistent with the purpose of both the Basin Plan and the Porter-Cologne Water Quality Control Act.

██ The real flaw in the County's argument is that it ignores a fundamental premise of statutory and regulatory interpretation, that the words must be construed in context. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) " 'The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute [citation], and where possible the language should be read so as to conform to the spirit of the enactment. [Citation.]' [Citation.] [¶] Where statutory provisions are unclear, they should be interpreted to achieve the purpose of the statutory scheme and the public policy underlying the legislation. [Citation.]" (*Conrad v. Medical Bd. of California* (1996) 48 Cal.App.4th 1038, 1046 [55 Cal.Rptr.2d 901].)

The trial judge, experienced in water law, having read numerous basin plans, noted that both the Porter-Cologne Water Quality Control Act and the

Basin Plan are fundamentally concerned with the protection of present and future beneficial uses of water. The various provisions of the Basin Plan reflect this central concern. It requires water quality objectives to protect beneficial uses. The Basin Plan uses MUN as an abbreviation for the beneficial use of water for community, military, or individual water supply systems. All groundwaters in the region are considered suitable or potentially suitable for municipal and domestic water supply (MUN). In establishing water quality objectives, the Regional Board must consider past, present, and probable future beneficial uses. The objectives for groundwaters "apply to all ground waters of the Sacramento and San Joaquin River Basins, as the objectives are relevant to the protection of designated beneficial uses."

Read in the context of the Basin Plan as a whole, the water quality objective for "ground waters used for domestic or municipal supply (MUN)" refers to groundwaters designated for use as domestic or municipal supply. The reference to the use of water refers to its beneficial use, which has been designated by the Regional Board. All groundwaters in the Sacramento and San Joaquin River Basins have been designated as MUN and the designation includes probable future uses. Nothing in the Basin Plan distinguishes between present and future uses of water. Restricting the water quality objective for bacteria to groundwaters based on current uses would read in a temporal element not found in the language of the Basin Plan. Such an interpretation would depart from the language and intent of the Basin Plan to a greater extent than reading "used for" to mean "designated as."

In support of its argument the County cites the Regional Board's proposed amendment to the Basin Plan to change the water quality objective bacteria in groundwaters. Instead of reading "In ground waters used for domestic or municipal supply (MUN)," the revision would read "In ground waters designated for use as domestic or municipal supply (MUN)." The Regional Board characterized the change as "non-substantive editing." The County requests that this court take judicial notice of a transcript of an agenda item and minutes of a State Board meeting at which the State Board declined to adopt the amendment but tabled the matter. The County contends these actions show the Regional Board's interpretation is new or inconsistent with the Basin Plan.

■ We decline the request for judicial notice. The actions of State Board occurred in May 2004, after the revised waste discharge requirements at issue here were adopted in January 2004. It is not proper to take judicial notice of evidence that was not before the agency at the time it made its decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Furthermore, the State Board's failure to adopt the amendment has little evidentiary value on the question of

the proper interpretation of the Basin Plan. ■ The failure to adopt an amendment evokes conflicting inferences as to whether the amendment was necessary, whether it was merely a clarification or a change in the law. "As evidence of legislative intent, unadopted proposals have been held to have little value. [Citations.]" (*California Court Reporters Assn. v. Judicial Council of California* (1995) 39 Cal.App.4th 15, 32 [46 Cal.Rptr.2d 44].)

■ We find the water quality orders at issue are consistent with the Basin Plan and effectuate the intent to protect present and future beneficial uses of groundwaters. Accordingly, we need not address the County's contention that the Regional Board failed to comply with the Water Code in imposing a new interpretation.

## DISPOSITION

The judgment is affirmed. Defendants and respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)

Sims, Acting P. J., concurred.

**RAYE, J.,** Dissenting.—The issue that we resolve in this case arises from what respondents' counsel characterized at oral argument as the "unfortunate" drafting of the water quality objective for bacteria in the basin plan for the Sacramento and San Joaquin River Basins (Basin Plan). In other words, the language of the Basin Plan does not read as the Regional Water Quality Control Board for the Central Valley Region (Regional Board) wishes it did and perhaps as the Regional Board intended.

It is not our role to plumb the consciousness of regulation drafters and mold the language of a regulation to comport with their undisclosed intent. As with the construction of statutes, so also in ascertaining the meaning of regulations, we divine intent from the language actually used and not the language one supposes the drafters might have used had they anticipated the legal dispute now before us. To the extent the language does not accurately reflect what the drafters had in mind and application of the language actually used could lead to an environmental catastrophe, the cries of despair should be directed to the governmental bodies empowered to alter the language. This court is not one of those bodies and should not indulge arguments that seek to amend in the guise of interpreting a regulation. Because I believe the majority opinion does that, I must respectfully dissent.

*Background*

The facts underlying this dispute are remarkably clear. The Regional Board adopted the Basin Plan, which sets forth the water quality objective for

bacteria as follows: "In ground waters used for domestic or municipal supply (MUN) the most probable number of coliform organisms over any seven-day period shall be less than 2.2/100 ml."

In January 2004 the Regional Board adopted a revised waste discharge requirements order for the Boys Ranch wastewater treatment facility. The parties acknowledge that there are fewer than three homes within a three-mile radius of the Ranch, and there is no domestic or municipal water supply serving those homes. Therefore, the wastewater from the Boys Ranch facility is not released into groundwaters used for an existing domestic or municipal water supply. Nonetheless, the majority would approve the Regional Board's application of the Basin Plan's bacteria standards to wastewater discharged from the Boys Ranch treatment facility into underlying groundwaters that are not used by any existing domestic or municipal water supply.

There are good reasons for this outcome: basin plans are all about the protection of both present and future beneficial uses of water. Therefore, in establishing water quality objectives, the Regional Board must consider not only present uses but also future uses. To the extent the past offers insight into the future, past uses are also relevant. Moreover, the Regional Board offers a persuasive technical argument, that restricting water quality objectives for bacteria to current groundwater uses could allow water to become so contaminated that it could never be used for drinking water.

All this makes perfect sense. But the language of the regulation does not support these policies. Whatever our views on the wisdom of the Regional Board's proposed order, we are not given free reign to import our notions of commonsense and good environmental policy into the language of the regulation—language that we are obliged apply by its terms. And denominating these policy notions as part of the "context" within which the language of the regulation must be construed is at best disingenuous. The interpretation of an administrative regulation is subject to the same principles as the interpretation of a statute. (*Blumenfeld v. San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 59 [117 Cal.Rptr. 327].) We must employ the plain meaning of the regulatory text. (*Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 148–149 [18 Cal.Rptr.3d 417] (*Environmental Charter*).)

There is no doubt the Regional Board could write a basin plan that would support the order it has adopted for the Boys Ranch wastewater treatment facility. However, the existing language does not.

I understand that we defer to an agency's interpretation of a regulation involving its area of expertise. Indeed, the authorities cited by the majority

for this proposition also extend deference to an administrative agency's interpretation of a *statute* involving its area of expertise. (*Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 252 [51 Cal.Rptr.3d 497].) However, deference is not capitulation. The responsibility for discerning the meaning of a regulation, like that of a statute, is reposed in this court.

It is tempting to apply a more relaxed standard of review to a regulation; after all, the agency wrote it. However, like the Legislature, administrative agencies are not given unfettered authority to write whatever regulations they desire whenever they choose; procedures must be followed. Water quality control plans are in fact regulations and are neither expressly nor impliedly exempt from the provisions of the Administrative Procedure Act (APA; Gov. Code, §§ 11340 et seq., 11370 et seq.). (*State Water Resources Control Bd. v. Office of Admin. Law* (1993) 12 Cal.App.4th 697 [16 Cal.Rptr.2d 25].) The APA imposes substantial constraints on an agency's rulemaking authority. (See Gov. Code, § 11340 et seq.) Hearings must be held, public comments received, and reviews conducted. We should not permit the process to be circumvented through acquiescence in the Regional Board's interpretive powers.

While the Regional Board criticizes the County of Sacramento's reliance on dictionary definitions in applying the language in question, we often resort to dictionaries in construing the language of statutes and regulations. Indeed, a fundamental tenet of statutory construction is that the court must first consult the words of the statute, giving them their plain meaning. When the language at issue is clear, the courts should not indulge in construction. "A dictionary is a proper source to determine the usual and ordinary meaning of a word or phrase in a statute." (*E. W. Bliss Co. v. Superior Court* (1989) 210 Cal.App.3d 1254, 1258, fn. 2 [258 Cal.Rptr. 783].)

We do not, of course, apply dictionary definitions when it is clear a different meaning was intended, as when words are used in a technical sense. However, the regional boards have proposed no good etymological reason why the nontechnical terms "[i]n ground waters used for domestic or municipal supply (MUN)" should be read as "designated for use." The suggestion that construing the language in the present tense imports a "temporal element" is no more than skillful word play. Absent additional modifiers, it is not reasonable to suppose the Regional Board was intending to regulate the entire universe of groundwater, whether used in the past, in the present, or potentially in the future. Such a construction would, as a practical matter, render what was clearly intended to be a restrictive phrase, "used for domestic or municipal supply (MUN)," unnecessary.

The majority argues: "In general parlance, the phrase ["used for"] is broad and includes both present and future uses. For example, 'chairs are used for sitting,' is not limited to the chairs' current use." (Maj. opn., *ante*, at p. 1588.) The analogy illustrates the fallacy of the majority's wordplay. The phrase "used for" only suggests present and future uses when it describes the function of an object without limitation. Thus, if the regulation simply stated "ground waters are used for domestic or municipal supply," I would agree that groundwaters have been, can be, and will in the future be used for domestic or municipal water supply. However, the regulation does not simply describe groundwaters but places restrictions on substances discharged into groundwaters of a certain type, viz: "[i]n ground waters used for domestic or municipal supply." To suggest that such a restriction applies to groundwaters that have in the past been used but are not currently used for domestic or municipal supply, or groundwaters that may be used for domestic or water supply at some time in this millennium or the next, makes a mockery of the language.

The majority's interpretation defies the plain meaning rule. It is also at odds with the principle that words of a regulation must be interpreted in context, " 'harmonizing to the extent possible all provisions relating to the same subject matter.' " (*Environmental Charter, supra*, 122 Cal.App.4th at p. 149.) In addition to the water quality objective for coliform organisms, the same section of the Basin Plan also includes water quality objectives for chemical constituents in groundwater and for radioactivity in groundwater. However, these water quality objectives only apply to groundwaters "*designated* for use as domestic or municipal supply (MUN)." The use of more restrictive language for the bacteria objective is at odds with the Regional Board's argument that the term "used" includes waters "designated for use." Similarly, at the same time the subject Basin Plan was adopted the Regional Board also adopted a plan for the Tulare Lake Basin that restricts the water quality objective for coliform organisms to "ground waters designated MUN."

Perhaps this is all "unfortunate" drafting. However, the usual tools employed to discern the meaning of regulations do not permit us to modify language. Instead of seeking relief from this court, the Regional Board should pursue its administrative remedies. I also note that even in the absence of the disputed water quality objective pertaining to bacteria, the Regional Board is empowered to impose the same discharge restrictions under the authority of Water Code section 13263. This statutory procedure is more cumbersome but would address any public health concerns pending changes in the Basin Plan.

To conclude, I do not agree that the language of the Basin Plan supports the trial court's judgment. For that reason I respectfully dissent.