Filed 12/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SANTA CLARA VALLEY WATER DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO BAY REGIONAL WATER QUALITY CONTROL BOARD,<br><br>    Defendant and Respondent. | A157127<br><br>(Contra Costa County Super. Ct. No. MSN17-1822) |

The Regional Water Quality Control Board, San Francisco Bay Region (Board) ordered the Santa Clara Valley Water District (District) to mitigate the environmental effects of a flood control project. The District filed a petition for writ of administrative mandate challenging the order under the Clean Water Act,[1] the Porter-Cologne Water Quality Control Act (Porter-Cologne Act; Wat. Code, § 13000 et seq.), and the California Environmental Quality Act (CEQA; Pub. Resources Code, §§ 21000 et seq.).[2] The trial court denied the petition. As the District has failed to demonstrate reversible error, we shall affirm.

---

[1] For more on the Clean Water Act, including its official name, see footnote 3, *post*.

[2] Undesignated statutory citations are to the Public Resources Code.

## BACKGROUND

Berryessa Creek in Santa Clara County drains from the Diablo Range hills into a tributary of Coyote Creek and ultimately into San Francisco Bay. Historically, one stretch of the creek known as Upper Berryessa Creek overtopped its banks every 10 to 20 years and flooded nearby areas of Milpitas and San Jose. In the 1980s, the United States Army Corps of Engineers (the Corps) began working on plans to build a flood control project on Berryessa Creek. However, the project did not move forward until 2013, when the construction of a new BART station in the area, which could be affected by a flood from the creek, sparked a renewed interest in the flood control project. At that point, the Corps began conducting environmental review under federal law for the project, which it completed in 2014. The Corps' environmental impact study named the District as the project sponsor. Under the terms of an agreement between the Corps and the District, the Corps was responsible for the design and construction of the project, and the District was responsible for acquiring real property rights, making the land available to the Corps, and conducting operations and maintenance of the project.

In early 2015, Board staff visited the project site and submitted comments on the Corps' design. The comments suggested various changes for the project to meet the Board's environmental requirements, including that the Corps' project proposal should include mitigation of the project's impacts on wetlands. However, the Corps refused to make some of the requested changes, because the changes exceeded the scope of the project's authorization from Congress and the Corps' environmental review.

In September 2015, the District, as the lead agency for the project, issued a draft environmental impact report (EIR) under CEQA. Board staff

2

submitted comments on the draft EIR, and the District issued a final EIR in January 2016. The final EIR found that the project would have substantial impacts on some aspects of water resources, but that those impacts could be reduced to a less-than-significant level through the adoption of various mitigation measures.

Meanwhile, in September 2015, the Corps applied to the Board under section 401 of the Clean Water Act for a certificate that the project complied with state law.[3] (33 U.S.C. § 1341.) Such a certification is generally necessary before a federal agency such as the Corps will approve a project that involves a discharge into navigable waters. (33 U.S.C. § 1341(a)(1); but see 33 U.S.C. § 1344(r) [allowing the discharge of dredged or fill material without a 401 certification if the project meets certain requirements].) Because the Corps' application did not contain, among other things, a proposal for compensatory mitigation to address project impacts on waters and wetlands, the Board notified the Corps that its application was incomplete. The state's congressional delegation and the Governor's office then pressured the Board to approve the project, because the project was needed to protect the BART station under construction and the project could lose its federal funding if the Board did not issue the section 401 certificate soon. As a compromise measure, the Board, the Corps, and the District agreed that the Board would issue its section 401 certification quickly, so that the Corps could proceed with construction. The Board made clear to the

---

[3] The Clean Water Act is the common name for the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended in 1972 and 1977. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 620.) The section 401 certificate is named after the section of the Clean Water Act in which it was enacted, which is codified at 33 U.S.C. section 1341. Hereafter, all references to "section 401 certificate" or "section 401 certification" are to 33 U.S.C. section 1341.

District, however, that after issuing the section 401 certification, it would subsequently issue waste discharge requirements (WDRs) under the Porter-Cologne Act to address project design issues and other impacts that were not handled under the section 401 certification.

Consistent with this agreement, the Board's executive officer issued a section 401 certificate for the project in March 2016. That certificate noted that it was being issued to facilitate the construction schedule for the project relative to the opening of the BART station. The certificate stated that the Board would later consider adoption of WDRs to address, among other things, "compensation" for impacts from the project, with the District to be named as the responsible entity. The certificate further stated that the Board, as a responsible agency under CEQA, found that environmental impacts during the construction of the project that were within the Board's purview would be mitigated to less-than-significant levels. However, in the same paragraph the certificate again stated that the Board would later consider WDRs to address the need to "compensate for temporal and permanent losses of functions and values" that were attributable to the project's design, operation, and maintenance. The District later admitted it understood when the Board issued the certificate that the Board intended to pursue WDRs in a separate proceeding, although the District did not think additional mitigation and WDRs for the design were necessary and believed the mitigation would relate only to the project's operation.

In April 2017, after holding two hearings and taking public comment, the Board issued a WDR order requiring the Corps and the District to provide additional mitigation to compensate for the project's impacts on water quality. The order, which was issued when construction on the project was almost complete, stated that it was rescinding and superseding the previous

4

section 401 certification and replacing it with a new certification and WDRs. The order also stated that it was issued under the authority of section 13263, subdivision (a) of the Water Code, which is part of the Porter-Cologne Act, and title 23, California Code of Regulations, section 3857.

The order required the District and the Corps to provide off-site mitigation of the project's effects by enhancing about 15,000 linear feet or 15 acres of waters of the state. The Board was willing to allow one of the District's other planned projects to satisfy the mitigation requirement to avoid forcing the District to fund and perform any additional projects, so the order provided examples of potential mitigation projects that corresponded to projects the District was already pursuing. The order addressed CEQA by stating that the Board had considered the EIR and found that in combination with the order's mitigation requirements, impacts from the project's construction would be mitigated to less-than-significant levels. Following issuance of the WDR order, the Board agreed with the District's proposal to use a specific planned project to satisfy the order.

The District sought review of the Board's order from the State Water Resources Control Board (State Board) in May 2017, but that request was denied by operation of law in May 2018. (Cal. Code Regs., tit. 23, § 2050.5, subd. (b).) While its petition for review before the State Board was pending, the District filed a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5 challenging the order under CEQA. After the State Board denied the District's petition for review by taking no action on it within the time allotted by regulation (see Cal. Code Regs., tit. 23, § 2050.5, subd. (b)), the District amended its administrative writ petition to add several causes of action challenging the order under section 401 of the Clean Water Act, the Porter-Cologne Act, and other laws. Following briefing

5

on the merits and a hearing, the trial court denied the petition in February 2019 in a 24-page statement of decision. The District timely appealed from the ensuing judgment.

## DISCUSSION

The District offers four arguments as to why the trial court erred in denying its administrative writ petition challenging the Board's WDR order. First, the District argues the Board's attempted rescission and reissuance of the section 401 certificate was invalid because it violated a one-year time limit for action under section 401 of the Clean Water Act. Second, it contends the Board had no authority to issue the order under the Porter-Cologne Act because the project did not involve the discharge of any waste into state waters. Third, it argues the Board's failure to impose the mitigation requirements as part of the Board's CEQA review of the project barred it from imposing those requirements later in its WDR order. Fourth, the District contends the Board committed a prejudicial abuse of discretion because its mitigation requirements are not supported by substantial evidence. We consider each argument in turn.

Under the Porter-Cologne Act, we review the trial court's factual findings for substantial evidence and review de novo its rulings on questions of law, such as the interpretation of statutes. (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 190.) For the District's CEQA challenge, we review the Board's action, not the trial court's decision, and we review the Board's factual findings for substantial evidence but determine de novo whether the Board followed the correct procedures. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427; *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.)

6

## I. Clean Water Act

Section 401 of the Clean Water Act provides that before a federal license or permit can be issued for a project that may result in a discharge into intrastate navigable waters, the applicant must apply to the state where the discharge will originate for a certification that the project will not violate certain water quality standards, including those set in the state's own laws. (33 U.S.C. § 1341(a)(1); *S.D. Warren Co. v. Maine Bd. of Environmental Protection* (2006) 547 U.S. 370, 374.)  The state's section 401 certification may impose conditions or limitations on the applicant that then become binding under federal law.  (33 U.S.C. § 1341(d); *Keating v. F.E.R.C.* (D.C. Cir. 1991) 927 F.2d 616, 623.)  However, if a state "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application."  (33 U.S.C. § 1341(a)(1).)  The applicant cannot obtain a federal license or permit unless the state has either issued the certificate or waived its authority to do so by failing to take action within the reasonable period of time.  (*Ibid.*)  The Corps' regulations generally require it to comply with this certification requirement for its own projects like the one at issue here, even though technically the Corps does not issue itself a federal permit.  (33 C.F.R. § 335.2.)

The District argues the Board's rescission and reissuance of the 2016 section 401 certification violated the one-year limit for a certificate under section 401 and was therefore invalid. (See 33 U.S.C. § 1341(a)(1).)  This may be correct.  (See, e.g., *City of Shoreacres v. Texas Com. of Environmental Quality* (Tex.Ct.App. 2005) 166 S.W.3d 825, 834–835 ["states are not authorized under the Clean Water Act to unilaterally revoke, modify, or

amend a state water quality certification after the certification process for a federal permit is complete"]; *Airport Communities Coalition v. Graves* (W.D. Wash. 2003) 280 F.Supp.2d 1207, 1215 ["the plain language of the statute . . . reflects clear congressional intent that federal agencies only be bound by state certification conditions issued within one year after notice"].) However, we need not examine this issue in detail because the District has not shown that the allegedly invalid rescission and reissuance of the section 401 certification would justify reversal. As we explain in further detail in Sections II and III, *infra*, the Porter-Cologne Act provides sufficient independent authority for the Board's WDR order.[4] (Wat. Code, § 13263, subd. (a)(1) [regional board shall prescribe requirements for discharges of waste into waters of the state]; Cal. Code of Regs., tit. 23, § 3857 [regional

---

[4] In its supplemental brief addressing this court's question as to whether either the Clean Water Act or Porter-Cologne Act is alone sufficient to support the WDR order, the District argues only that neither law is independently sufficient because the order does not specify which law authorizes each of its particular mitigation requirements. The District's sole authority for this contention is the general principle that Code of Civil Procedure section 1094.5 requires an agency to "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order" in order to facilitate meaningful judicial review. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 (*Topanga Assn.*).) Even assuming the District is correct that this principle requires the Board to specify the legal basis for the requirements in its order, the order here meets the test because it states that it is issued under both section 401 of the Clean Water Act (33 U.S.C. § 1341) and section 13263 of the Porter-Cologne Act. Right or wrong, the order's citation to these statutes is sufficiently clear to allow for judicial review of the Board's reasoning and does not force us to "grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the" Board. (*Id.* at p. 516.)

board's authority to issue a section 401 certification is not intended to prevent it from issuing waste discharge requirements].)

## II. Porter-Cologne Act

The goal of the Porter-Cologne Act "is 'to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.' ([Wat. Code,] § 13000.) The task of accomplishing this belongs to the [State Board] and the nine Regional Water Quality Control Boards . . . ." (*City of Burbank v. State Water Resources Control Bd.*, *supra*, 35 Cal.4th at p. 619.) To that end, anyone "discharging waste, or proposing to discharge waste, within any region that could affect the quality of the waters of the state" must file with the appropriate regional board a report of the discharge. (Wat. Code, § 13260, subd. (a)(1).) Then, the "regional board, after any necessary hearing, *shall prescribe* requirements as to the nature of any proposed discharge . . . with relation to the conditions existing in the disposal area or receiving waters upon, or into which, the discharge is made or proposed." (Wat. Code, § 13263, subd. (a), italics added.) Water Code section 13050, subdivision (d), states that waste for these purposes "includes sewage and any and all other waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation, including waste placed within containers of whatever nature prior to, and for purposes of, disposal."

The trial court followed *Lake Madrone Water Dist. v. State Water Resources Control Bd.* (1989) 209 Cal.App.3d 163 (*Lake Madrone*) to conclude the project's sedimentation effects qualified as the discharge of waste. In that case, sediment accumulated at the bottom of a reservoir and the dam

9

operator then used valves in the dam to flush the sediment into the stream below the dam. (*Id.* at 166.) The court held that "concentrated silt or sediment associated with human habitation and harmful to the aquatic environment is 'waste' under" Water Code section 13050. (*Id.* at p. 169.) *Lake Madrone* reasoned that while the silt in an unconcentrated form was innocuous, it became waste when it became so concentrated through the construction and operation of the dam that its discharge from the dam was deadly to aquatic life. (*Id.* at pp. 169–170.)

The District argues the Board did not have authority to issue WDRs for the project because the project's sedimentation effects do not constitute the discharge of waste. However, the District does not challenge *Lake Madrone*'s interpretation of waste as potentially including silt and sediment, nor does it raise a challenge to the sufficiency of the evidence as to the trial court's factual findings relating to its interpretation of the term "waste." Instead, its argument is aimed at the legal question of whether something like sediment must be useless, unneeded, left over, or discarded to qualify as waste under Water Code section 13050 and *Lake Madrone*. The District posits that this requirement is not met here because the project's effect of collecting sediment does not qualify as the discarding or discharging of a useless substance.

We need not decide whether the District's interpretation is correct because we conclude that even if sediment has to be useless, left over, or discarded for its discharge to be covered under Water Code section 13263, that test would be met here. Although the District correctly notes that the project will not move sediment within the creek in precisely the same way that the dam valves in *Lake Madrone* transferred concentrated sediment to particular areas below the dam, the District admits that the project's widening of the creek bed will slow the flow of water and lead to increased

sedimentation that will be concentrated in the creek instead of carried downstream. This additional sediment that will be left behind is not useful or needed because it obstructs the flow of water in the creek and, as the trial court found, would likely require periodic removal that could disrupt the generation of plants and wildlife in the creek. Thus, even under the District's preferred definition of the term, the project will involve the discharge of waste under Water Code section 13050.[5] The Board therefore had jurisdiction to impose mitigation requirements related to the project. (Wat. Code, § 13263, subd. (a).)

## III. CEQA

The District next contends that the Board's failure to impose mitigation requirements through the avenues available to it under CEQA barred the Board from later imposing those requirements through the WDRs under the Porter-Cologne Act.

" 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment.' " (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1220.) The lead agency on a

---

[5] The District observes that the Board's order stated that the increased sediment could provide more wildlife habitat. However, the District fails to mention that the Board's order also noted that this benefit would not be realized if the sediment must be removed at such a volume and frequency that it prevents the development of a low-flow channel. To the extent the District intends with this argument to challenge the sufficiency of the evidence supporting the trial court's order, we reject it because the District has failed to summarize all of the evidence favorable and unfavorable to the trial court's order. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 [" 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*' "].)

11

project is responsible for preparing an EIR. (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 927; § 21100, subd. (a); Cal. Code of Regs., tit. 14 (CEQA Guidelines), §§ 15082, 15087, 15089.) "Under CEQA, when a project involves two or more public agencies, ordinarily only one agency can serve as the lead agency. ([CEQA] Guidelines, §§ 15050, 15051.)[6] CEQA thus distinguishes lead agencies from responsible agencies: whereas the lead agency has 'principal responsibility' for the project, a responsible agency is 'a public agency, other than the lead agency, which has responsibility for carrying out or approving a project.' (Pub. Resources Code, §§ 21067, 21069.)" (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 239.)

The District's CEQA argument rests on CEQA Guidelines section 15096, which governs the division of responsibility for CEQA compliance between lead and responsible agencies. As subdivision (a) of that provision explains, "[a] responsible agency complies with CEQA by considering the EIR or negative declaration prepared by the lead agency and by reaching its own conclusions on whether and how to approve the project involved." (CEQA Guidelines, § 15096, subd. (a).) The District contends the Board's mitigation requirements in the WDR order ran afoul of CEQA Guidelines section 15096, subdivision (e), which states, "If a responsible agency believes that the final EIR or negative declaration prepared by the lead agency is not adequate for use by the responsible agency, the responsible agency must either: [¶] (1) Take the issue to court within 30 days after the lead agency files a notice of determination; [¶] (2) Be deemed to have waived any objection to the

---

[6] " 'In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163, fn. 7.)

adequacy of the EIR or negative declaration; [¶] (3) Prepare a subsequent EIR if permissible under [CEQA Guidelines] Section 15162; or [¶] (4) Assume the lead agency role as provided in [CEQA Guidelines] Section 15052[, subd.] (a)(3)."

According to the District, the Board's decision to impose additional mitigation requirements indicates that it disagreed with the EIR's conclusion that the mitigation measures identified in the EIR would reduce the project's significant impacts on the environment to less-than-significant levels. Because the Board failed to raise this disagreement through one of the avenues specified in CEQA Guidelines section 15096, subdivision (e) (filing suit, preparing a subsequent EIR if permissible, or assuming the lead agency role), the District maintains the Board must be deemed to have waived its mitigation concerns under CEQA Guidelines section 15096, subdivision (e)(2), thereby preventing the Board from exercising its Porter-Cologne Act authority to issue the WDR order. The District further contends that absent a challenge to an EIR within the statutory period via an administrate writ petition, CEQA's interest in finality takes precedence and the EIR must be conclusively presumed valid unless it was fundamentally inaccurate or misleading.

Before turning to the merits of the District's arguments, we note at the outset that the issue of whether CEQA bars the Board's attempt to impose additional mitigation requirements arose here out of the Board's apparent violation of CEQA. The Board said in its section 401 certification that it was approving the construction of the project under CEQA, but at the same time noted that the EIR lacked the detail necessary to assess long-term impacts and stated the Board's intent to address the need for compensation of such impacts later that year. Then, in its WDR order, which it issued when

13

construction on the project was almost complete, the Board purported to make findings under CEQA again and addressed all of the project's impacts. This approach does not appear to comply with the rule that "an agency cannot formally approve a project, or commit itself to approve it, without complying with CEQA before doing so." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2019) § 4.15; see also *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 138 [applying the "general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project,' " including the alternative of not moving forward with a project].) The result of this sequence is that the District is arguing that CEQA makes binding the Board's explicitly *unfinished* CEQA findings in the initial section 401 certification, such that the Board is barred from taking the additional actions that were specifically outlined in the certification. The Board, meanwhile, argues that CEQA allowed the Board to conduct additional environmental review after it had approved the project, even though under CEQA that approval should have occurred only after the completion of all environmental review.

In any event, whatever the flaws in its CEQA procedure, the Board has the better of the dispute as the parties have framed it. CEQA Guidelines section 15096 may prevent a responsible agency from requiring additional environmental review after a lead agency has completed its CEQA review, so long as the responsible agency does not have its own independent authority to enforce or administer an environmental law. (See *Ogden Environmental Services v. City of San Diego* (S.D. Cal. 1988) 687 F.Supp. 1436, 1451–1453.) But here, the Board has independent authority—and indeed the obligation—

to administer and enforce the Porter-Cologne Act. (Wat. Code, § 13263, subd. (a) [regional board "*shall* prescribe requirements as to the nature of any proposed discharge, existing discharge, or material change in an existing discharge," italics added].)[7]

In these circumstances, CEQA's savings clause in Public Resources Code section 21174 makes clear that CEQA does not prevent the Board from discharging its Porter-Cologne Act responsibilities. Section 21174 provides in relevant part: "No provision of this division is a limitation or restriction on the power or authority of any public agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer . . . ." (§ 21174.) The trial court relied on section 21174 in its ruling that the Board's duties under CEQA did not deprive the Board of its independent authority under other laws to impose the mitigation requirements in its order. The Board likewise relies on section 21174 in this court. And yet the District does not even mention section 21174 in its briefing.

Section 21174 directly refutes the District's argument. The District's position boils down to the contention that CEQA, through CEQA Guidelines section 15096, subdivision (e), limits or restricts the Board's power to administer and enforce the Porter-Cologne Act. As section 21174 provides that no provision of CEQA has this effect, the District's interpretation of CEQA Guidelines section 15096, subdivision (e) in this context is incorrect.

---

[7] As explained above (*see* Section I, *supra*), we have rejected for similar reasons the District's claim that the alleged violation of the one-year timeframe in section 401 of the Clean Water Act deprived the Board of its independent authority to issue the WDR order pursuant to the Porter-Cologne Act. (33 U.S.C. § 1341; Wat. Code, § 13263, subd. (a); Cal. Code of Regs., tit. 23, § 3857).

15

The Legislature did not intend for the EIR process under CEQA to be used to defeat an agency's authority under other statutes. The District's attempts to demonstrate the finality and preclusive effect of its EIR under CEQA are therefore fruitless.[8] (See, e.g., *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 69–70; *Ione Valley Land, Air, & Water Defense Alliance, LLC v. County of Amador* (2019) 33 Cal.App.5th 165, 171.) No matter how final and unassailable the EIR might be under CEQA, because the Board's WDR order rests on the Porter-Cologne Act and not CEQA, section 21174 dictates that the EIR's finality cannot prevent the Board from exercising its independent Porter-Cologne Act authority to protect water quality.

Other CEQA provisions confirm our interpretation. Section 21003, subdivision (a) declares that it is state policy that "[l]ocal agencies integrate the requirements of this division with planning and environmental review procedures otherwise required by law or by local practice so that all those procedures, *to the maximum feasible extent*, run concurrently, rather than consecutively." (§ 21003, subd. (a), italics added.) Similarly, CEQA Guidelines section 15080, which is based in part on Public Resources Code section 21003, states, "*To the extent possible*, the EIR process should be combined with the existing planning, review, and project approval process used by each public agency." (CEQA Guidelines, § 15080, italics added.) The limiting phrases "to the maximum feasible extent" and "[t]o the extent possible" reflect an acknowledgement that even though unified CEQA review and environmental regulation should be the norm, there may be times when

---

[8] The District's citations to cases holding that the completion of a project can moot a CEQA challenge are also inapposite, because the Board's WDR order was not a CEQA challenge. (See, e.g., *Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1541.)

a public agency's own environmental regulation can take place after CEQA review, as permitted by section 21174.

While it ignores section 21174, the District briefly discusses *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921 (*Pacific Lumber*), a case on which both the trial court and the Board relied. Our Supreme Court there considered whether a regional board's input into the Department of Forestry and Fire Protection's approval process for a timber harvesting plan under the Z'berg–Nejedly Forest Practice Act of 1973 (§ 4511 et seq.; Forest Practice Act) provided the exclusive mechanism for a regional water board to exercise its authority to regulate water quality issues such a plan might raise. (*Pacific Lumber*, at p. 926.) The regional board's input consisted of assisting the director of the Department of Forestry and Fire Protection in evaluating a proposed plan's effects on water quality and, if the regional board disagreed with the director's approval of the plan, appealing the approval to the Board of Forestry. (*Id.* at pp. 931–932.) The California Supreme Court rejected the contention that the approval process for timber harvesting plans displaced the regional board's authority under the Porter-Cologne Act, stating that the argument "suffer[ed] from a fundamental flaw, in that it [ran] headlong into the Forest Practice Act's savings clause, which provides: 'No provision of this chapter or any ruling, requirement, or policy of the [Board of Forestry] is a limitation on . . . the power of any state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer.' " (*Id.* at p. 933, italics omitted.) The Court concluded that this savings clause, "[a]s a direct and pellucid expression of legislative intent," controlled the relationship between the Forest Practice Act and the Porter-Cologne Act. (*Id.* at p. 934.)

*Pacific Lumber* is not squarely on point, as the District points out, because it did not involve CEQA and CEQA Guidelines section 15096, subdivision (e) gave the Board here more formal authority over the District's project than the role the regional board exercised in *Pacific Lumber*. Nonetheless, the savings clause at issue in *Pacific Lumber* is virtually identical to section 21174, so *Pacific Lumber* is analogous and provides helpful guidance. Like the provision at issue in *Pacific Lumber*, the "obvious meaning" of section 21174 is that nothing in CEQA, including CEQA Guidelines section 15096, subdivision (e) or the statutes on which it is based, bars the Board from fulfilling its independent obligation to enforce the Porter-Cologne Act. (*Pacific Lumber*, *supra*, 37 Cal.4th at p. 934.)

*Pacific Lumber* is also helpful in evaluating the District's subsidiary contention that California law prohibits a party to a first adjudicatory proceeding from using a second proceeding to collaterally attack the findings an agency made in the first. As *Pacific Lumber* stated, "[f]or an administrative decision to have collateral estoppel effect, it and its prior proceedings must possess a judicial character," indicia of which include "a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision." (*Pacific Lumber, supra*, 37 Cal.4th at p. 944.) The Court there held the regional board's involvement in the approval of the timber harvesting plan did not possess a judicial character because it did not possess many of the necessary indicia, such as the opportunity to cross-examine witnesses, and because the regional board's role was merely consultative. (*Ibid.*) *Pacific Lumber* also refused to apply collateral estoppel

because doing so would render meaningless the Forest Practice Act's savings clause. (*Id.* at p. 945.)

While the Board's role here was more than consultative, both of *Pacific Lumber*'s other considerations apply with full force. The District's CEQA proceedings did not involve a hearing before an impartial decision maker, testimony under oath, or the opportunity to call, examine, and cross-examine witnesses, and applying collateral estoppel would make the savings clause in section 21174 meaningless. Like the trial court, we conclude the CEQA proceedings on the District's EIR did not collaterally estop the Board from issuing its WDR order.

The District and its amici are concerned that the CEQA process will become a meaningless exercise if responsible agencies with authority to enforce environmental laws are permitted to impose additional environmental mitigation requirements on projects after CEQA review is complete. They worry that responsible agencies will go through the motions of cooperating with a lead agency in the preparation of an EIR and then hold their own proceedings later, imposing additional costs and unpredictability on project proponents. In a related vein, they contend that allowing a responsible agency to impose additional mitigation requirements outside of CEQA would defeat the purpose of the EIR, which is supposed to be an informational document that lead and responsible agencies use to make their decisions. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 ["If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees"].) The amici even go so far as to accuse the Board of deliberately lying in the weeds,

19

without acknowledging that in the unique circumstances of this case it was not feasible for the Board to formulate additional mitigation requirements while at the same time meeting the timetable the District and key state and federal stakeholders insisted upon, a set of circumstances the District understood would lead to independent pursuit of WDRs by the Board.

We do not share these concerns, partly because they rest on an unwarranted assumption that government agencies will not discharge their CEQA responsibilities in good faith. More importantly, to the extent these concerns have any validity, CEQA already provides the answer, as it requires a public agency to complete CEQA review before committing itself to a project in a way that limits consideration of project alternatives and mitigation measures.[9] (*Save Tara v. City of West Hollywood*, *supra*, 45 Cal.4th at p. 138; 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2019) § 4.15.) This rule would likely allow a project's opponents to sue to prevent an agency from dividing its approval into two stages like the District—the project proponent—agreed the Board could do here, so the scenario the District and its amici fear should seldom arise. In this case, there is no indication that any outside party emerged to challenge the two-stage approval process, but agencies cannot count on such a lack of

---

[9] The District's amici cite an amendment to Water Code section 13160 enacted this year that allows the State Board to issue a section 401 certification without completing CEQA review in some circumstances. (Wat. Code, § 13160, subd. (b)(2); Stats. 2020, ch. 18, § 9, eff. June 29, 2020.) This amendment is not relevant here, both because it took effect after the events at issue in this case and because it concerns section 401 certifications, not WDRs under the Porter-Cologne Act. We also note that the amendment only addresses whether a regional board can issue a section 401 certificate and then complete CEQA review, rather than the situation here, where the Board completed CEQA review and then issued its WDR order. Section 21174 governs here.

20

opposition in the future. In any event, even if these concerns had merit, they are insufficient to overcome the plain language of section 21174, which the amici, like the District, fail to address.

We also reject the amici's argument that the Board's failure to challenge the District's EIR deprived the Board and the public of the ability to understand and comment on the Board's WDR order in a public forum. The Board's WDR order was issued after a months-long period of consultation with the District and the Corps, as well as two rounds of public comment and two public hearings. Whatever the flaws in the Board's process, the Board did not limit the District's participation in its environmental analysis or defeat the public's ability to understand and comment on the Board's action, so those CEQA aims were not thwarted here.

## IV. Excessiveness of the Board's mitigation requirements

The District raises sundry arguments against specific aspects of the mitigation requirements the Board imposed in its WDR order, such as whether substantial evidence supports the Board's determination that the creek would return to equilibrium in five to ten years after completion of the project, or whether the Board's requirement of mitigation of 15 off-site acres of wetlands was disproportionate to the project's effects on approximately 9.8 acres of wetlands alongside the creek. The District cites only a few documents in the record that tenuously support its arguments, rather than engaging in the extensive analysis of the evidence supporting and opposing the trial court's findings that is necessary for substantial evidence review. (*Huong Que, Inc. v. Luu, supra*, 150 Cal.App.4th at p. 409). For example, the District mentions that the Board relied on studies of ephemeral creeks to conclude the creek channel could not reestablish itself for five to ten years. But the District does not cite any of those studies in the record, and its only

21

explanation for why they do not constitute substantial evidence is an unsupported assertion that Upper Berryessa Creek differs significantly from the studies. The District does not even mention the evidence the trial court relied on to reject the District's arguments, which included reports by the Corps and others regarding stream restoration. This court is not obligated to conduct an independent scouring of the record pertinent to the District's arguments, so we will not discuss these arguments in detail. (*Ibid.*) We instead conclude that the District has failed to rebut the presumption that the record contains evidence to support the trial court's findings on these points. (*Ibid.*)

We are also unpersuaded by the District's argument that the Board used an incorrect definition of "waters of the state" (Wat. Code, § 13260, subd. (a)(1)) when it calculated that the District owed 15 acres of mitigation. The trial court declined to rule on this issue because the Board's order gave the District the choice of mitigating 15 acres or 15,000 linear feet of waters of the state and the District had not challenged the linear feet calculation. The trial court further found the issue was "rendered speculative" by the Board's acceptance of the District's proposal to use as mitigation a pre-existing District project that impacted 16 acres of a lake and restored 11 acres of a creek—effects that exceeded the 15-acre requirement. The trial court found no indication that the District might propose a smaller mitigation project in the future that would make it necessary to decide the correct acreage measurement.

The District asserts in its opening brief that it is entitled to a determination of a mitigation measure that is consistent with the proper definition of "waters of the state," but it does not explain why the linear feet measurement alone is insufficient or what might entitle the District to a

22

measurement of required mitigation in acres. Moreover, even if we were inclined to consider the merits of whether the Board incorrectly calculated the acreage of waters of the state that the project affected, the District's opening brief provides no authority or argument supporting its interpretation of "waters of the state" that would demonstrate prejudice from the trial court's refusal to take up the issue. (*Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 683 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived' "]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [error results in reversal only if it appears "reasonably probable" the appellant would have obtained a more favorable outcome absent the error].) Rather than citing to useful authority, the District simply asserts that "[t]he Board's number-out-of-a-hat system [for determining the required mitigation measurement in acres] was more akin to one's grandmother's recipe for a favorite family dish than an ascertainable standard for judicial review."

In its reply brief, the District cites *Topanga Assn., supra*, 11 Cal.3d at p. 515, and a CEQA provision to support its challenge to the merits of the Board's measurement of mitigation. Not only is this scant authority inapposite, it comes too late. " '[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.) In any event, the Board's WDR order does include the requisite "findings to bridge the analytic gap between the raw evidence and the ultimate decision or order." (*Topanga Assn., supra,* 11 Cal.3d at p. 515.) The order explains the facts and factors supporting the Board's decision to require a larger compensatory mitigation area (15 acres) than the area impacted by the project (approximately 9.8 acres). Those

reasons included that the mitigation would merely "enhance" riverine functions (as opposed to "restor[ing] or "creat[ing] riverine wetland area and functions"); the mitigation would be constructed within 12 months of the project's impacts, resulting in a "temporal loss of functions for one year"; the project site would only "partially recover" from the project impacts within five years; and it would take five years for the enhancement benefits from the mitigation to be "fully achieved."  Accordingly, even if the District had appropriately briefed this issue, there is no merit to its claim that the Board arbitrarily pulled a number out of a hat when it required 15 acres of compensatory mitigation.

## DISPOSITION

The trial court's judgment is affirmed.


BROWN, J.


WE CONCUR:

POLLAK, P. J.
STREETER, J.


*Santa Clara Valley Water District v. San Francisco Bay Regional Water Quality Control Board* (A157127)

Trial Court: Contra Costa County Superior Court

Trial Judge: Hon. Edward G. Weil

Counsel: Santa Clara Valley Water District, Stanly Yamamoto, District Counsel, Rita Chan, Assistant District Counsel; Briscoe Ivester & Bazel LLP, Peter Prows; Greines, Martin, Stein & Richland LLP, Timothy T. Coates, and Marc J. Poster for Plaintiff and Appellant

Xavier Becerra, Attorney General of California, Robert W. Byrne, Senior Assistant Attorney General, Myung J. Park, Supervising Deputy Attorney General, Gary Alexander, Deputy Attorney General, and Tiffany Yee, Deputy Attorneys General for Defendant and Respondent

Greenberg Traurig LLP, William J. Goines; Harrison Law LLC, Holly Harrison, and David Jorgensen for Association of California Water Agencies, California State Association of Counties, Imperial Irrigation District, and California Central Valley Flood Control Association as Amici Curiae on behalf of Plaintiff and Appellant

*Santa Clara Valley Water District v. San Francisco Bay Regional Water Quality Control Board* (A157127)